**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** ***ex rel.*** **GORDON F.B. ONDIS,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **CITY OF WOONSOCKET, RHODE ISLAND; SUSAN D. MENARD, in her capacity as Mayor of the City of Woonsocket; JOEL D. MATHEWS, in his capacity as Director of Planning and Community Development of the City of Woonsocket; PAULETTE MILLER, in her capacity as Assistant Director of Planning and Community Development of the City of Woonsocket; OWEN T. BEBEAU, in his capacity as Director of Human Services of the City of Woonsocket; MICHAEL ANNARUMMO, in his capacity as Director of Administration and Director of Public Works of the City of Woonsocket;** | ) | **CA 7-0150-T-D** |
| **Defendants.** | ) | |

**Relator's Supplemental Memorandum of Law**
**In Support Of His Objection to Motion to Dismiss**

*Background and History*

This matter was transferred to the District of Rhode Island from the District of Massachusetts where it was originally filed.

A hearing was held on Defendants' Motion to Dismiss in the Massachusetts court and the parties submitted two sets of briefs with supporting memoranda.

This supplemental memorandum addresses the remaining issues related to Defendants' Motion to Dismiss: [1]

1. Whether the complaint filed by Relator is sufficient to meet heightened pleading requirements; and

2. Whether the Court has subject matter jurisdiction based upon Relator's standing either as an original source or having based his action upon non-publicly disclosed information?

At the hearing on Defendants' Motion to Dismiss held on January 31, 2007 the Massachusetts Court opined that it was satisfied that the complaint had been pleaded with sufficient particularity and that it was unlikely the Court could decide the jurisdictional question without discovery. (See Mass. Dist Ct. Hrg. Tx. Jan. 31, 2007, p.4, ln.8-11.)

The Massachusetts Court thereupon ordered additional briefing and affidavits which were subsequently filed by the parties. The result was the order transferring Relator's claims to the Rhode Island District Court.

*Argument*

## I. DEFENDANTS' ASSERTIONS THAT RELATOR HAS NOT ALLEGED FALSE CLAIMS FLIES IN THE FACE OF THE LAW AND THE FACTS AS PROVIDED IN DETAIL WITHIN THE COMPLAINT.

[1] The Massachusetts Court dismissed the claims against Defendants in their individual capacities and Relator's conspiracy allegation with leave to bring those claims again if evidence in discovery indicates personal gain by any of the Defendants. If such evidence is adduced in discovery, Relator intends to seek to bring those claims once again.

A claim pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, ("FCA") is defined as "any request or demand . . . for money or property which is made . . . if the United States Government provides [or will reimburse] any portion of the money or property which is requested or demanded." Maturi v. McLaughlin Research Corp., 413 F.3d 166, 171 fn13 (1st Cir. 2005) (quoting 31 U.S.C. § 3729(c)). A number of courts have also found FCA violations where a defendant falsely certifies compliance with certain conditions required as a prerequisite for a government benefit or payment in order to induce that benefit. See, e.g., U.S., Thompson v. Columbia/HCA Healthcare, 125 F.3d 899, 902 (5th Cir. 1997). In such cases, false certification for the purpose of receiving a payment or benefit becomes the practical equivalent of a statutory false claim. United States ex rel. Karvelas v. Melrose- Wakefield Hosp., 360 F.3d 220, 229-233 (1st Cir. 2004).

A reading of the underlying Supreme Court holding in United States v. Neifert-White Co. makes clear that Defendants' attempts to narrowly define a "claim" are grossly misplaced. "Analogous reasoning leads us to hold today that the False Claims Act should not be given the narrow reading that respondent urges. This remedial statute reaches beyond "claims" which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money. We believe the term "claim," as used in the statute, is broad enough to reach the conduct alleged by the Government in its complaint." United States v. Neifert-White Co., 390 U.S. 228, 233 (U.S. 1968).

Relator's complaint identifies false claims generally, specifically, repeatedly and in great detail. It easily complies with the pleading requirements to establish submission of a false claim.

The complaint describes the false submissions to HUD for the purpose of obtaining money. "Such transactions are the specific, false claims of Defendants contained in each of the

consolidated and action plans filed with HUD beginning fiscal year 2000-2001 through fiscal year 2004-2005 (also known as the Consolidated Five (5) Year Plan) and Consolidated Annual Performance and Evaluation Reports, shown to be false in light of the true policies of Defendants and the subsequent receipt of money from HUD to which Defendant City would not otherwise be entitled but for such false statements." (Complaint, ¶ 8.)

Indeed, HUD regulations make clear that communities eligible for Community Development Block Grant funds must declare how they will comply with the Natioinal Housing Objectives (42 U.S.C. 5301) and how they intend to remove public policy impediments to the creation of affordable housing. Truthful disclosure that, in fact, the City of Woonsocket was actively involved in **creating** institutional impediments to affordable housing would have nullified Woonsocket's attempts to receive federal housing funds. Moreover, Relator's complaint clearly alleges that Defendants falsely executed numerous certifications required in HUD regulations pursuant to statute. Indeed, the facts known and learned by Relator as incorporated in his Complaint are in direct contravention of the certifications which must be made by the City of Woonsocket and its representatives in order to obtain federal funds from HUD. See Exhibit Two.

The nexus between the Defendants' false statements and subsequent payment by the government to Defendant Woonsocket is replete throughout the complaint. *Inter alia*, Relator alleges in his complaint specific false statements made by Defendants which are conditions precedent to the City's receipt of federal funds, as well as many of the falsely executed certifications that are required of successful grant recipients as listed in Exhibit Two:

> 1. "The City of Woonsocket will continue to advocate for the preservation of affordable housing and assess opportunities to secure additional rental assistance if and when it becomes available…Where feasible, the City will evaluate whether to apply for additional vouchers to augment the supply of affordable housing throughout the city and will recommend that other agencies apply where appropriate." Consolidated Plan 2000-

2005, City of Woonsocket, Rhode Island, p.32. (United States of America, ex rel. Gordon F.B. Ondis v. City of Woonsocket, Rhode Island et al., Complaint at p.20 ¶ 49(g). See Evidence, Volume I Exhibit #1).

2. "Woonsocket has assigned a relative need of 'high' to all extremely low income households because of the limited supply of affordable housing available to these households. The needs of Woonsocket's extremely low income households will continue to be addressed through Federal rental assistance, public housing and grant programs." Supra at 38. (United States ex rel. Ondis Compl. at p.20 ¶ 49(i). See Evidence Volume I Exhibit #1).

3. "Due to the City's shortage of affordable rental housing, increasing housing opportunities for families remains a high priority in Woonsocket. Within the rental housing category both small related and large related households received high priority in each income category. This is due to the shortage of family assisted housing available in Woonsocket's current housing stock, as described in the Housing Needs and Homelessness Assessment." Supra at 38. (United States ex rel. Ondis Compl. at p.20 ¶ 49(j). See Evidence Volume I Exhibit #1).

4. "As discussed in the Housing and Homelessness Needs Assessment, there is a need for more affordable housing throughout Woonsocket and all of Rhode Island. This includes general rental assistance as well as rental assistance for specific populations." Supra at 43. (United States ex rel. Ondis Compl. at p.21 ¶ 49(k). See Evidence Volume I Exhibit #1).

5. "As discussed in the Housing and Homelessness Needs Assessment, there is a need for more affordable housing throughout Woonsocket and all of Rhode Island. This includes general rental assistance as well as rental assistance for specific populations." Consolidated Plan 2000-2005 – Section 4 – amended 6-20-00, City of Woonsocket, R.I., p. 6. (United States ex rel. Ondis Compl. at p.21 ¶ 49(m). See Evidence Volume I Exhibit #1).

6. "In Rhode Island resistance to affordable housing may exist in neighborhoods which are zoned exclusively for single-family use. In the past decade, Woonsocket has updated its Zoning Ordinance to allow for Mixed-Use Residential zones which promotes affordability and convenience to renters. The City also has a Residential Planned Development zone to allow for the flexible development of large tracts of residential land. The rapid growth of the 1980's resulted in widespread antigrowth movements, which lead to revised zoning and subdivision regulations. Size requirements, coupled with the high cost of land, make development of affordable housing difficult." Consolidated Plan 2000-2005, City of Woonsocket, Rhode Island, p. 56. (United States ex rel. Ondis Compl. at p.21-22 ¶ 49(o). See Evidence Volume I Exhibit #1).

7. "Resources from private and non-Federal public sources that are reasonably expected to be made available to address the needs identified in the plan include debt financing, equity, expertise, materials, donations are critical elements of Woonsocket's affordable housing agenda. Major sources of private investment include the Woonsocket Neighborhood Development Corporation…" Supra at 65. (United States ex rel. Ondis Compl. at p.22 ¶ 49(q). See Evidence, Volume I Exhibit #1).

8. "Woonsocket is committed to reducing the number of families living in poverty. It is widely recognized that affordable housing must be linked with supportive social services or the cycle of homelessness and poverty will continue." Consolidated Plan 2000-2005 – Section 7 – amended 6-29-00, City of Woonsocket, R.I., p. 4. (United States ex rel. Ondis Compl. at p.22 ¶ 49(r). See Evidence Volume I Exhibit #1).

9. "Its' consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objective that provide decent housing, expand economic

opportunities primarily for persons of low and moderate income." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47. (United States ex rel. Ondis Compl. at p.23-24 ¶ 50(c). See Evidence Volume I Exhibit #1).

10. "It is following a current consolidated plan (or Comprehensive Housing Affordability Strategy that has been approved by HUD." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47. (United States ex rel. Ondis Compl. at p.24 ¶ 50(d). See Evidence Volume I Exhibit #1).

11. "The grant will be conducted and administered in conformity with Title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47. (United States ex rel. Ondis Compl. at p.24 ¶ 50(g). See Evidence Volume I Exhibit #1).

12. "The city recognizes its growing minority populations. It pledges that all of its programs will include proactive, positive and inclusionary efforts to promote housing choice in all areas of the city." City of Woonsocket, RI – Consolidate (sic) Plan 2000-2005 Executive Summary, p. 4. (United States ex rel. Ondis Compl. at p.25 ¶ 52(a). See also Compl. at p.35 ¶56 (p). See Evidence Volume I Exhibit #1).

13. "Woonsocket's housing priorities emphasize the need to use existing structures, whether they are occupied or abandoned. The city takes a variety of approaches to accomplish this goal and apply it to all segments of the city's population. Among its high priorities are to "…provide rental assistance for cost-burdened households and individuals." Supra at 6. . (United States ex rel. Ondis Compl. at p.25 ¶ 52(c). See Evidence Volume I Exhibit #1).

14. "A critical element of the city's affordable housing agenda is the use of private resources in debt financing, equity, donations of housing materials and land, and expertise." Supra at 7. . (United States ex rel. Ondis Compl. at p.26 ¶ 52(d). See Evidence Volume I Exhibit #1).

15. "Within the framework of the national objectives, the City of Woonsocket has set forth a Consolidated Plan that generally identifies the City's Housing and non-housing community development needs and objectives." Consolidated Plan, 2000-2005, City of Woonsocket, Rhode Island, p. 73. (United States ex rel. Ondis Compl. at p.26 ¶ 53(b). See Evidence Volume I Exhibit #1).

16. "Woonsocket has traditionally relied on public and assisted housing to house its extremely low-income population that is not homeless and does not have special needs. Woonsocket will continue to use these programs to meet the needs of extremely low-income households. Due to unpredictable federal funding, Woonsocket will take steps to preserve the existing affordable housing stock throughout the city. Obstacles to preserving existing affordable housing include Section 8 expiring contracts, expiring use developments, and the cost of lead reduction". City of Woonsocket, Rhode Island Annual Action Plan July 1, 2002 – June 30, 2003 p.8. (United States ex rel Ondis Compl. at p.28 ¶ 56 (d). See Evidence Volume I Exhibit #1). (See also Ondis Compl. at p. 32 ¶ 56 (e). See evidence Volume II Exhibit #4).

17. As well, the following general certification was included in the annual Action Plan for 2002-2003, signed May 3, 2002 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

"The jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard. (United States ex rel. Ondis Compl. at p.28 ¶ 55(e). See Evidence Volume I Exhibit #3).

> 18. The following specific CDBG certification was included in the annual Action Plan for 2002-2003, signed May 3, 2002 by Mayor Susan D. Menard on behalf of the City of Woonsocket:
>
> "Its consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objectives that provide decent housing, expand economic opportunities primarily for persons of low and moderate income. (See CFR 24 570.2 and CFR 24 part 570)." (United States ex rel. Ondis Compl. p.28 ¶ 55(f). See Evidence Volume I Exhibit #3).
>
> 19. "The City recognizes its growing minority population. It pledges that all of its programs will include proactive, positive, and inclusionary efforts to promote housing choice in all areas of the city. It admits, however, that there are some neighborhoods where these efforts fall short." Supra. (United States ex rel. Ondis Compl. at p. 29-30 ¶ 55(i); see Evidence Volume I Exhibit #3).
>
> 20. "Woonsocket's housing priorities emphasize the need to use existing structures, whether they are occupied or abandoned. The city takes a variety of approaches to accomplish this goal and apply it to all segments of the city's population." Supra at 6. (United States ex rel. Ondis Compl. at p. 30 ¶ 55(k). See Evidence Volume I Exhibit #3).
>
> 21. In a cover letter dated May 9, 2003 to Mr. James H. Barnes, Director of US Department of Housing and Urban Development Office of Community Planning and Development, 10 Causeway Street, Boston, Massachusetts, Defendant City (over the signature of Deputy Director of Housing and Community Development, Paulette Miller) assured HUD that a "unified vision for community development actions was identified." The letter further falsely confirmed that the city's plan for spending federal money was adopted "keeping in mind the statutory program goals of decent housing, suitable living environment and expanded economic opportunities." (United States ex rel. Ondis Compl. at p.31 ¶ 56(a). See Evidence Volume I Exhibit #3.

Ignoring the case law establishing the broad definition of a "claim," Defendants seem to suggest that it is permissible to make false, material representations to the government as long as such statements are not included on the invoice sent to HUD to obtain millions of dollars that might have otherwise been made available to compliant communities. In fact, these specific references to individual false statements made by the Defendants in their submissions to HUD constitute the specific frauds calculated to obtain money from the government under false pretenses. These many paragraphs of specific false statements constitute the specificity that Defendants find so lacking.

Although Defendants fail to even address the holding of the Supreme Court in Neifert-White or in the other cases cited by Relator, they have previously drawn the Court's attention to

Dookeran v. Mercy Hosp. of Pittsburgh, 281 F.3d 105, 109 (3d Cir. 2002), as seeming to stand for the principle that a federal application generally is not part of a claim. Dookeran involved an application to become a participant in a medical study and had no connection or relationship, even remotely, with money. "Specifically, the application was a request that Mercy be designated a clinical center for the NSABP STAR P-2 study. It was not a request or demand for federal funds." Dookeran v. Mercy Hosp. of Pittsburgh, 281 F.3d 105, 109 (3d Cir. 2002).

In truth, there is no precedent for the proposition advanced by Defendants. The law of Seifert-White applies. False statements in applications to obtain federal grant money are "false claims" under the False Claims Act.

## II. RELATOR CONTENDS THAT THIS COURT HAS STANDING TO HEAR THIS CASE BECAUSE (A) HE IS AN ORIGINAL SOURCE, OR (B) THERE WAS NO PUBLIC DISCLOSURE OF THE ALLEGATIONS AND/OR TRANSACTIONS UNDERLYING THIS ACTION WITHIN THE MEANING OF THE FALSE CLAIMS ACT.

### A) Original Source

The False Claims Act eliminates federal court jurisdiction over actions under § 3730 of the Act that are based upon the public disclosure of allegations or transactions "unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." § 3730(e)(4)(A). Rockwell Int'l Corp. v. United States, 549 U.S. ___, 127 S. Ct. 1397, 1401 (U.S. 2007).

The Rockwell case, decided after arguments before Judge Wolf, offers binding precedent yet was curiously omitted and left unaddressed by Defendants. Rockwell is helpful in clarifying the requirements for status as an "original source". Specifically, the Supreme Court explains that

a Relator is adjudged to be an "original source" based upon the information he had and voluntarily provided to the government.

Thus, the focus of original source analysis is the subjective knowledge held by the Relator, not on limited facts which form the basis of a few scant newspaper articles which never rise to the status of allegation.

> "..the 'information' to which subparagraph (B) [31 U.S.C. § 3730(e)(4)(b) [2]] speaks is the information upon which the relators' allegations are based. To begin with, subparagraph (B) standing on its own suggests that disposition. The relator must have "direct and independent knowledge of the information on which the allegations are based," and he must "provide the information to the Government before filing an action under this section which is based on the information." **Surely the information one would expect a relator to "provide to the Government before filing an action . . . based on the information" is the information underlying the relator's claims.**
>
> Subparagraph (A) [31 U.S.C. § 3730(e)(4)(b)(A)] complicates matters. As described earlier, it bars actions based on the "public disclosure of allegations or transactions" and provides an exception for cases brought by "an original source of the information." **If the allegations referred to in subparagraph (B)'s phrase requiring "direct and independent knowledge of the information on which the allegations are based," are the same "allegations" referred to in subparagraph (A), then original-source status would depend on knowledge of information underlying the publicly disclosed allegations.** The principal textual difficulty with that interpretation is that subparagraph (A) does not speak simply of "allegations," but of "allegations or transactions." **Had Congress wanted to link original-source status to information underlying the public disclosure, it would surely have used the identical phrase, "allegations or transactions"; there is no conceivable reason to require direct and independent knowledge of publicly disclosed allegations but not of publicly disclosed transactions.**
>
> The sense of the matter offers strong additional support for this interpretation. Section 3730(e)(4)(A) bars actions based on publicly disclosed allegations whether or not the information on which those allegations are based has been made public. It is difficult to understand why Congress would care whether a relator knows about the information underlying a publicly disclosed allegation…when the relator has direct and independent knowledge of different

[2] Paragraph (B) of 31 U.S.C. § 3730(e)(4) refers to the "original source" concept. That is, the relator must have "direct and independent knowledge of the information on which the allegations are based."

> information supporting the same allegation... Not only would that make little sense, it would raise nettlesome procedural problems, placing courts in the position of comparing the relator's information with the often unknowable information on which the public disclosure was based. Where that latter information has not been disclosed (by reason, for example, of a reporter's desire to protect his source), the relator would presumably be out of court. To bar a relator with direct and independent knowledge of information underlying his allegations just because no one can know what information underlies the similar allegations of some other person simply makes no sense.
>
> Rockwell, 127 S. Ct. at 1407 (emphasis added).

Paragraph 8 of the complaint specifically sets forth Relator's contention that he is an "original source", identifies the basis of his conclusion and avers facts that underlie his contention. The Court should, in accord with Rule 12 Motion to Dismiss standard of review, accept the facts pled as true and deny Defendants' motion.

In this case, Relator Ondis' status as an "original source" is not based upon his knowledge of any public disclosure. In fact, Relator was in a unique position to appreciate and understand the significance of Defendant Menard's words as she strode into one of his properties vowing to rid Woonsocket of Section 8 housing. As specifically averred in the Complaint, Relator has provided affordable housing in Woonsocket and elsewhere for many years. (Complaint, ¶8.) He was well aware that Woonsocket was the recipient of Community Development Block Grant ("CDBG") and other HUD funds. Upon hearing the Mayor's remarks, Relator knew, based on his own experience, that Woonsocket could not at the same time attempt to remove Section 8 affordable housing and simultaneously receive Community Development Block Grant funding from HUD unless the City and other Defendants made false claims to the federal government. Relator's contention that he is an "original source" is not merely conclusory as suggested by Defendants. The facts underlying Relator's "original source" status are specifically averred in the complaint. (Complaint, ¶¶ 8, 21-30; see also Affs. of Gordon F.B. Ondis and Lee M. Matthews.)

An "original source" is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing [suit]." 31 U.S.C. § 3730(e)(4)(B). This provision has been construed to impose a conjunctive requirement of demonstrating that the relator's knowledge is both direct and independent. See U.S. ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 656 (D.C. Cir. 1994). A relator's knowledge is "direct" if she acquired it through her own efforts without an intervening agency, and it is "independent" if her knowledge is not dependent on the public disclosure. See id.; U.S. ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 93 (D. Mass. 2001).

The facts pled by Relator specifically and precisely comply with the definition of “original source” in O’Keeffe as cited by Defendants themselves. There are no facts that suggest that prior to the intrusion of Defendant Menard on the property of Relator there was any realization or awareness by anyone of the frauds perpetrated by Defendants on the government. Moreover, there are no facts suggesting that Relator had even been aware of the existence of the few newspaper articles provided to the Court as evidence of public disclosure. Clearly, the realization of the existence of false statements to the government came to the Relator as a result solely of the Mayor’s pronouncement of her plans for affordable housing in the context of Relator’s background and experience.

Interestingly, while Relator’s knowledge that a fundamental fraud had occurred is based upon his background and experience, he did commission further investigation based upon his recognition of the divergence of Mayor Menard’s stated intention to rid Woonsocket of affordable housing and necessary certifications to obtain HUD funds. Courts have held that even where there was no uniquely situated relator, such as Gordon Ondis, an investigation

commissioned by an individual can qualify that person as a relator. "At least one court has held that knowledge obtained through an investigation can be the basis for a qui tam action. See U.S. ex rel. Hartigan v. Palumbo Bros., Inc., 797 F. Supp. 624, 630-31 (N.D. Ill. 1992)." U.S. ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1017 (7th Cir. 1999).

It is not problematic that Relator recognized a likely fraud and then sought information to confirm his suspicions. Indeed, "there are situations in which a relator can derive some of his information about a fraud from public disclosures, but also have direct and independent knowledge of the alleged fraud. Thus, the original source provision does enlarge the category of persons eligible to file *qui tam* suits. The key to understanding how the two provisions work together is as follows: a lawsuit is "based upon" a public disclosure if the relator actually derived *a significant part* of the information underlying the lawsuit from the specific public disclosure. The relator is an "original source" if, in addition to satisfying the requirement of voluntarily disclosing his information to the Government prior to filing suit, the relator had direct and independent knowledge of *another significant part* of the information underlying the lawsuit." 24 Pub. Cont. L.J. 477.

At bar, Relator avers that he had knowledge of the underlying inconsistency of the City's housing policy with required National Housing Objectives and CDBG certifications gained from the Mayor's statements to his employees within the context of his long housing experience.

**B) No Public Disclosure**

There has been no public disclosure of any allegation of inconsistency between Woonsocket's statements to HUD and its true public policy. Only Relator Ondis has made this accusation based upon his unique circumstance.

Indeed, only a small fraction of the facts contained in Relator's voluminous complaint were contained in the newspaper articles advanced by Defendants as constituting public disclosure.[3]

A close analysis of newspaper articles provided to the Court reveals that they do not address many of the allegations made in Relator's complaint, further demonstrating that Relator's basis of knowledge is not the result of public disclosure. For example, Defendants have provided no articles regarding the allegation of harassment of the Neighborhood Development Corporation ("NDC"). (Complaint, ¶¶ 75-80.) The only article provided relates to the refusal of the NDC to sell lots to the City (*"WNDC rings up? No sale?" Woonsocket Call, February 7, 2001).* No articles are presented relative to the frustration of Excel Management. (Complaint, ¶ 82.) No article is provided regarding the Andola Fibres matter alleged. (Complaint, ¶¶ 91-97.) No article is provided regarding the allegations contained in the complaint in paragraphs 107-113. No article is provided regarding the allegations contained in the complaint in paragraphs 114-120. No article is provided regarding the allegations contained in the complaint in paragraphs 121-123. No article is provided regarding the allegations contained in the complaint in paragraphs 124-132.

It is important to keep in mind that there was no disclosure in these newspaper articles of the false statements made in the multiple submissions to HUD. Indeed, Relator has described the multiple devices employed by Defendants to prevent public disclosure of the federal application materials including, despite certifications to HUD to the contrary, (a) failing to deposit federal

[3] The original submission of these articles by affidavit of counsel in a Rule 12 motion is wholly improper. This is another attempt by Defendants to treat their motion as one for summary judgment without the benefit of discovery. The Court ought not consider this material in adjudication of the pending motion.

submissions in the public library, (b) failing to honor a public records request for inspection, and (c) making underlying public body minutes difficult, if not impossible, to search.

Defendants have suggested that the inclusion of false statements in its submissions to the government constitutes public disclosure. This ludicrous circular reasoning, if applied, would result in a bar to all False Claims Act suits inasmuch as an essential element of the cause of action is the submission of false statements or claims to the government, such documents almost always being public records. Again, Defendants misconstrue the public disclosure rule which bars only actions where disclosure of **allegations, not documents,** has occurred.

The significance of newspaper articles describing elements of the Defendant City's true view and policy regarding affordable housing are meaningless without knowledge of the specific false certifications and statements made to the federal government. And, as has been alleged, the fact that these certifications and statements made by the Defendants were false was unavailable to the government or anyone else as a direct result of the Defendants' own conduct until later disclosed by Relator.

The widely accepted formula for determination of public disclosure propounded in U.S. ex rel. Springfield Terminal Ry. v. Quinn has been misapplied by Defendants.

Indeed, application of the now famous (in FCA circles) X + Y = Z formula for analysis of public disclosure leads to the inescapable conclusion that there has been no public disclosure at bar. "In Springfield Terminal Rwy., the Court of Appeals for the District of Columbia Circuit articulated a helpful and straightforward framework for applying the jurisdictional bar of § 3730(e)(4)(A). According to that framework, "if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer

Z, i.e., the conclusion that fraud has been committed." United States ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 94 (D. Mass. 2001) (quoting U.S. ex rel. Springfield Terminal Ry., 14 F.3d at 654.) In this case, there has been no allegation of fraud disclosed prior to this action and the crucial element of the fraud—what the government was told—has, in fact, been hidden by Defendants. **In short, there has been no disclosure of X and of a good portion of Y. Consequently, no individual not uniquely situated could have concluded Y.** Under the formula of Springfield Terminal, Defendants may not prevail.

A critical overlay to analysis of the Defendants' public disclosure contentions is found in Relator's allegations regarding the specific, intentional efforts to keep its fraud from public disclosure.

Relator's Complaint alleges purposeful attempts to hide its conduct from public view. (Complaint, ¶¶ 124-132.) These attempts are demonstrated by the City's:

1. Refusal to provide records of its HUD submissions when requested;
2. Failure to deposit HUD submissions in the public library as promised to HUD;
3. Organization of zoning and other records so as to make search of violative affordable housing policy difficult, if not impossible, to locate; and
4 Violation of specific certifications to HUD regarding the availability of public records.

It is ironic that Defendants now seek to escape responsibility for their own conduct. The Defendants' intentional policy of preventing public disclosure of their conduct is not only legally significant, but critical to this case. (See Exhibit One, Hrg. Tr. at 11, ln. 11-18.)

*Conclusion*

Defendants attempt to excuse their conduct by suggesting that others could have observed the disjoinder of the truth as compared to Woonsocket's submissions to HUD and that this lawsuit is, at its core, a political dispute.

The simple facts are that no one else made the observation of fraud or, if realized, chose to turn a blind eye. It is irrelevant that there are multiple potential relators as there surely are in the many health care providers and military contractors who have been subject to FCA lawsuits. The only relevant question is: Does Gordon F.B. Ondis qualify to prosecute this action? The answer is resoundingly yes!

Equally fallacious and irrelevant is the contention that this action results from a political dispute. In so asserting, Defendants have not cited to a single fact that any dispute existed between the city administration and Relator Ondis prior to this action. In truth, that task is impossible because there was no pre-existing dispute and because Relator, in fact, has in the past financially contributed to the campaign of the city's mayor—Susan Menard.

The proffered Motion to Dismiss should not be granted based upon the arguments and averments presented herein and at oral argument.

United States of America, ex rel
Gordon F.B. Ondis

By his Attorneys,

/s/ David C. Clarke
David C. Clarke, Esq. (#6376)
**BLAIS CUNNINGHAM**
**& CROWE CHESTER**
150 Main Street, P.O. Box 1325
Pawtucket, Rhode Island 02862
(401) 723-1122 (tel)
(401) 726-6140 (fax)
dclarke@blaislaw.com

/s/ Leon A. Blais
Leon A. Blais, Esq.
**BLAIS AND PARENT**
20 Cabot Blvd.
Suite 300
Mansfield, MA 02048
508 618-1280
866 329-6175 fax
LBlais@BlaisParent.com

CERTIFICATION

I herewith certify that I have filed this document pursuant to rules and procedures pursuant to local ECF filing. A copy of this document is available on the PACER system.

/s/ David C. Clarke
David C. Clarke, Esq.