**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br>***ex rel.* GORDON F.B. ONDIS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CITY OF WOONSOCKET, RHODE ISLAND; SUSAN D. MENARD, in her capacity as Mayor of the City of Woonsocket; JOEL D. MATHEWS, in his capacity as Director of Planning and Community Development of the City of Woonsocket; PAULETTE MILLER, in her capacity as Assistant Director of Planning and Community Development of the City of Woonsocket; OWEN T. BEBEAU, in his capacity as Director of Human Services of the City of Woonsocket; MICHAEL ANNARUMMO, in his capacity as Director of Administration and Director of Public Works of the City of Woonsocket;**<br><br>**Defendants.** | **)** | **CA 7-0150-T-D** |

**Exhibits 1-2 To Relator's Supplemental Memorandum of Law**

**In Support Of His Objection to Motion to Dismiss**

# EXHIBIT ONE

# (Mass. Dist. Court Hearing Transcript Excerpts)

Judge Mark Wolf:

My present tentative views are as follows. The heart of the case is Count 1, the False Claims Act claim, and at the moment, although I regard the public disclosure point as a serious one, I'm not inclined to think that the case can be resolved on the motion to dismiss. The 12(b)(6) standard is very favorable to the relator and, at the moment, it seems to me that the 9(b) standards are met, their specific claims adequately alleged, it's alleged that they were false. And while I've looked at those newspaper articles, there may be a question as to how many of them I can properly consider at this point and whether that important public disclosure point is really amenable to being resolved on a motion to dismiss.

Hng. Tr. p. 4

I've considered the elements of False Claims Act claims described by the First Circuit in Karvelas. I think, at the moment, the relator has alleged a claim for the purpose of the False Claims Act. I started by focusing on the very first, that consolidated plan submitted in 2000, which is first addressed in Paragraph 49 of the complaint.

As I understand it, a claim is a statement made for the purpose and effect of inducing the government

10

immediately to part with money, the First Circuit said in Rivera, which is a case you may not have cited, quoting a Supreme Court case, Neifert-White. But government submissions that represent eligibility for benefits or compliance with regulations have been characterized as claims in Mikes and also in Karvelas. I think the regulations, which you may not have cited, but I can take into account, define a consolidated plan as, quote, "A submission for Federal funds under HUD's formula grant programs," and that's 24 CFR Section 91.1(b)(2) and in Paragraphs 18 and 49, that type of plan is alleged.

It seems to me that the allegedly false claims are described with the specificity required by Rule 9(b) in Karvelas. In Paragraphs 47 to 57, on Pages 18 to 38, there were very specific allegations of false statements, in particular, of documents that you have the essentially who, what, when. Paragraph 49(g) says that 2000 consolidated plan represented that the City would continue to advocate for the preservation of affordable housing, and Paragraphs 117 to 119 allege how that representation was purportedly false.

As I understand it, it's alleged that the Mayor signed the plan with the allegedly false statements. I'm inclined to think that it's adequately alleged that

11

the Mayor, and perhaps other defendants, knew the City policy was being falsely represented. Knowledge can be alleged generally under the law. But the plaintiff alleges that at the time of the 2000 consolidated plan and later, while the plan represented to HUD expressly supported for increasing affordable housing, the relator says the true policy was to oppose programs for which they were requesting funding and points to some statements that would refute the representations in the plan.

There's the subsidiary of -- I would say, issue of whether it was false to represent that the applications and plans would be available at the Woonsocket Public Library? I think, if you get to it, the relator will have to prove that the defendants didn't intend to make them publicly available when they made the statements, but there is a set of facts which could be proven that might meet that high standard.

The subject matter jurisdiction issue with regard to the public disclosure struck me as the most competitive. There are certain things that they're adequately referenced in the complaint that I can take into account as if they were incorporated pursuant to decisions like Watterson and Beddal, but it's not clear to me that all of those newspaper reports are properly



before me right now.

And it's also not clear to me whether all of the claims were publicly disclosed by being filed? Those cases, Farmington, Judge Tauro's decision in Ross,

indicate that you don't necessarily have public disclosure of what some of them call the "X" just by filing the claim.

It's also, at the moment, not sufficiently clear to me that the claims are based on public disclosure. I wrote in LaValley, almost 20 years ago, one of the first decisions after the 1986 amendments about what this meant, but I didn't have the benefit of all the other decisions. I see I'm now a minority and my distinguished colleague, Judge Saris, is with the majority, so she might be right -- might very well be right.

I think that if I stuck with my view in LaValley, the plaintiffs, the relator would prevail on this point, but that may not -- I do want to focus on whether, if I adopt now the majority view described by Judge Saris in O'Keeffe, I -- if it would result in a dismissal? The relator, on Page 14 to 15 of his memo, points out a lot of particulars that are not -- that are alleged in the complaint that aren't reflected in the media articles. This strikes me as a pretty fact-specific inquiry. It's

13

one that Judge Saris in O'Keeffe did on summary judgment. I have real -- that while I'm engaged by this issue, I have real concerns about whether it can be resolved at this stage.

<u>Hng. Tr. pp. 9-13</u>

# EXHIBIT TWO

# (Certifications Required by HUD)

[1] § 91.225 Certifications.
(a) General. The following certifications, satisfactory to HUD, must be included in the annual submission to HUD. (See definition of "certification" in § 91.5.)
(1) Affirmatively furthering fair housing. Each jurisdiction is required to submit a certification that it will affirmatively further fair housing, which means that it will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard.
(2) Anti-displacement and relocation plan. Each jurisdiction is required to submit a certification that it has in effect and is following a residential antidisplacement and relocation assistance plan in connection with any activity assisted with funding under the CDBG or HOME programs.
(3) Drug-free workplace. The jurisdiction must submit a certification with regard to drug-free workplace required by 24 CFR part 24, subpart F.
(4) Anti-lobbying. The jurisdiction must submit a certification with regard to compliance with restrictions on lobbying required by 24 CFR part 87, together with disclosure forms, if required by that part.
(5) Authority of jurisdiction. The jurisdiction must submit a certification that the consolidated plan is authorized under State and local law (as applicable) and that the jurisdiction possesses the legal authority to carry out the programs for which it is seeking funding, in accordance with applicable HUD regulations.
(6) Consistency with plan. The jurisdiction must submit a certification that the housing activities to be undertaken with CDBG, HOME, ESG, and HOPWA funds are consistent with the strategic plan. Where the HOPWA funds are to be received by a city that is the most populous unit of general local government in an EMSA, it must obtain and keep on file certifications of consistency from the authorized public officials for each other locality in the EMSA in which housing assistance is provided.
(7) Acquisition and relocation. The jurisdiction must submit a certification that it will comply with the acquisition and relocation requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended (42 U.S.C. 4601), and implementing regulations at 49 CFR part 24.
(8) Section 3. The jurisdiction must submit a certification that it will comply with section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u), and implementing regulations at 24 CFR part 135.
(b) Community Development Block Grant program. For jurisdictions that seek funding under CDBG, the following certifications are required:
(1) Citizen participation. Each jurisdiction must certify that it is in full compliance and following a detailed citizen participation plan that satisfies the requirements of § 91.105.
(2) Community development plan. A certification that this consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objectives that have been developed in accordance with the primary objective of the statute authorizing the CDBG program, as described in 24 CFR 570.2, and requirements of this part and 24 CFR part 570.
(3) Following a plan. A certification that the jurisdiction is following a current consolidated plan (or Comprehensive Housing Affordability Strategy) that has been approved by HUD.
(4) Use of funds. A certification that the jurisdiction has complied with the following criteria:
(i) With respect to activities expected to be assisted with CDBG funds, the Action Plan has been developed so as to give the maximum feasible priority to activities that will benefit low- and moderate-income families or aid in the prevention or elimination of slums or blight. The plan may also include CDBG-assisted activities that are certified to be designed to meet other community development needs having particular urgency because existing conditions pose a serious and immediate threat to the health or welfare of the community where other financial resources are not available to meet such needs;
(ii) The aggregate use of CDBG funds, including section 108 guaranteed loans, during a period specified by the jurisdiction, consisting of one, two, or three specific consecutive program years, shall principally benefit low- and moderate-income families in a manner that ensures that at least 70 percent of the amount is expended for activities that benefit such persons during the designated period (see 24 CFR 570.3 for definition of "CDBG funds"); and
(iii) The jurisdiction will not attempt to recover any capital costs of public improvements assisted with CDBG funds, including Section 108 loan guaranteed funds, by assessing any amount against properties owned and occupied by persons of low- and moderate-income, including any fee charged or assessment made as a condition of obtaining access to such public improvements. However, if CDBG funds are used to pay the proportion of a fee or assessment

attributable to the capital costs of public improvements (assisted in part with CDBG funds) financed from other revenue sources, an assessment or charge may be made against the property with respect to the public improvements financed by a source other than CDBG funds. In addition, with respect to properties owned and occupied by moderate-income (but not low-income) families, an assessment or charge may be made against the property with respect to the public improvements financed by a source other than CDBG funds if the jurisdiction certifies that it lacks CDBG funds to cover the assessment.

(5) Excessive force. A certification that the jurisdiction has adopted and is enforcing:

(i) A policy prohibiting the use of excessive force by law enforcement agencies within its jurisdiction against any individuals engaged in non-violent civil rights demonstrations; and

(ii) A policy of enforcing applicable State and local laws against physically barring entrance to or exit from, a facility or location that is the subject of such non-violent civil rights demonstrations within its jurisdiction.

(6) Compliance with anti-discrimination laws. The jurisdiction must submit a certification that the grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d), the Fair Housing Act (42 U.S.C. 3601-3619), and implementing regulations.

(7) Compliance with lead-based paint procedures. The jurisdiction must submit a certification that its activities concerning lead-based paint will comply with the requirements of part 35, subparts A, B, J, K, and R of this title.

(8) Compliance with laws. A certification that the jurisdiction will comply with applicable laws.

(c) Emergency Shelter Grant program. For jurisdictions that seek funding under the Emergency Shelter Grant program, the following certifications are required:

(1) In the case of assistance involving major rehabilitation or conversion, the applicant will maintain any building for which assistance is used under the ESG program as a shelter for homeless individuals and families for not less than a 10-year period;

(2) In the case of assistance involving rehabilitation less than that covered under paragraph (d)(1) of this section, the applicant will maintain any building for which assistance is used under the ESG program as a shelter for homeless individuals and families for not less than a three-year period;

(3) In the case of assistance involving essential services (including but not limited to employment, health, drug abuse, or education) or maintenance, operation, insurance, utilities and furnishings, the applicant will provide services or shelter to homeless individuals and families for the period during which the ESG assistance is provided, without regard to a particular site or structure as long as the same general population is served;

(4) Any renovation carried out with ESG assistance shall be sufficient to ensure that the building involved is safe and sanitary;

(5) It will assist homeless individuals in obtaining appropriate supportive services, including permanent housing, medical and mental health treatment, counseling, supervision, and other services essential for achieving independent living, and other Federal, State, local, and private assistance available for such individuals;

(6) It will obtain matching amounts required under § 576.71 of this title;

(7) It will develop and implement procedures to ensure the confidentiality of records pertaining to any individual provided family violence prevention or treatment services under any project assisted under the ESG program, including protection against the release of the address or location of any family violence shelter project except with the written authorization of the person responsible for the operation of that shelter;

(8) To the maximum extent practicable, it will involve, through employment, volunteer services, or otherwise, homeless individuals and families in constructing, renovating, maintaining, and operating facilities assisted under this program, in providing services assisted under the program, and in providing services for occupants of facilities assisted under the program; and

(9) It is following a current HUD-approved consolidated plan (or CHAS).

(10) A certification that the jurisdiction has established a policy for the discharge of persons from publicly funded institutions or systems of care (such as health care facilities, foster care or other youth facilities, or correction programs and institutions) in order to prevent such discharge from immediately resulting in homelessness for such persons.

(d) HOME program. Each participating jurisdiction must provide the following certifications:

(1) If it plans to use HOME funds for tenant-based rental assistance, a certification that rental-based assistance is an essential element of its consolidated plan;

(2) A certification that it is using and will use HOME funds for eligible activities and costs, as described in §§ 92.205 through 92.209 of this subtitle and that it is not using and will not use HOME funds for prohibited activities, as described in § 92.214 of this subtitle; and

(3) A certification that before committing funds to a project, the participating jurisdiction will evaluate the project in accordance with guidelines that it adopts for this purpose and will not invest any more HOME funds in combination with other federal assistance than is necessary to provide affordable housing.

(e) Housing Opportunities for Persons With AIDS. For jurisdictions that seek funding under the Housing Opportunities for Persons With AIDS program, a certification is required by the jurisdiction that:

(1) Activities funded under the program will meet urgent needs that are not being met by available public and private

sources; and
(2) Any building or structure assisted under that program shall be operated for the purpose specified in the plan:
(i) For a period of not less than 10 years in the case of assistance involving new construction, substantial rehabilitation, or acquisition of a facility; or
(ii) For a period of not less than three years in the case of assistance involving non-substantial rehabilitation or repair of a building or structure.

24 CFR 91.225