UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* GORDON F.B. ONDIS<br><br>Plaintiff / Relator,<br><br>vs.<br><br>CITY OF WOONSOCKET, RHODE ISLAND;<br>and SUSAN D. MENARD, in her capacity as<br>Mayor of the City of Woonsocket, Rhode Island<br><br>Defendants. | ) | C.A. No. 07-150T |

**FIRST AMENDED COMPLAINT**
**AND**
**DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. Plaintiff, United States of America, through Gordon F.B. Ondis, Relator, brings this action under the False Claims Act, as amended, 31 U.S.C. § 3729, *et seq*.

2. Relator, on behalf of the United States, seeks recovery of damages, penalties, fees and expenses arising from certain affirmative false representations, assurances, statements and certifications, as well as certain material omissions of fact, made by the Defendants to the U.S. Department of Housing and Urban Development (hereinafter "HUD"). Defendants made these statements in an effort to obtain federal funds from the Community Development Block Grant Program (hereinafter "CDBG") and/or other similarly related federal programs. But for the Defendants' false representations, assurances, statements, certifications, and material omissions, HUD assistance would not have been provided to the Defendants. Moreover, HUD would have

been precluded by operation of law from providing financial assistance to the City of Woonsocket had it been aware that the true public policy of the Defendants discourages the development of affordable housing and compliance with the Fair Housing Act in total contravention of the CDBG and other similarly related programs.

## II. JURISDICTION AND VENUE

3. This action arises under 31 U.S.C. § 3729 *et seq*. ("the False Claims Act"). Accordingly, this Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3730(b) and 3732(a), and 28 U.S.C. §§ 1331 and 1345.

4. Venue is proper in this district by virtue of an Order of the United States District Court, District of Massachusetts, transferring Relator's claims to this Court. In addition, venue is proper in this district because at least one of the Defendants resides and transacts business in this District.

## III. PARTIES

5. Relator, Gordon F.B. Ondis, is the President of HEDCO, Ltd., a Rhode Island corporation that owns and operates approximately three hundred (300) units of housing within the City of Woonsocket, Rhode Island. HEDCO's housing principally serves low and moderate income populations, including minority, disabled and elderly citizens by acceptance of housing subsidy vouchers issued through HUD programs administered by the local housing authority, Woonsocket Housing Authority (hereinafter "WHA"). As such, HEDCO's housing is deemed affordable housing within the meaning of 42 U.S.C. § 5301, *et seq*. ("the Housing and Community Development Act").

Relator acquired direct, personal knowledge of the non-public information alleged herein as a result of threats made against him and his company, HEDCO, by Defendant Mayor Susan D. Menard (hereinafter "Mayor Menard"), personally, when Mayor Menard made an illegal and harassing entry onto property owned by HEDCO and declared her intention to eliminate a major affordable housing program in the City of Woonsocket. In response to Mayor Menard's declaration and harassment, Relator initiated his own inquiry into anti-affordable housing policies and deceptive practices of the City of Woonsocket and its Mayor. Prior to Relator's report to the government of the original source knowledge amassed by Relator, there has been no public disclosure of the allegations giving rise to this complaint and upon which it is based. Relator herewith seeks payment to him of the maximum amount of money allowed by law as recovered from Defendants herein together with reasonable attorney's fees, costs and expenses.

6. Defendant City of Woonsocket, Rhode Island (hereinafter "City") is a municipality within the State of Rhode Island, bordered by the Commonwealth of Massachusetts.

7. Defendant Susan D. Menard is the Mayor and Chief Executive Officer of the City (hereinafter "Mayor Menard") and is the signatory of all statements, assurances and certifications made for or on behalf of Defendant City, filed with HUD as referred to herein. Defendant Mayor supervises and directs the activities of the Department of Planning and Community Development, the municipal agency responsible for the actual preparation and submission of applications, certifications, assurances and representations to HUD. On May 15, 2000 and on May 3, 2000, and on numerous other dates through February 2005 (hereinafter "the false claims period") Mayor Menard personally signed applications containing material false statements in support of requests for federal assistance that accompanied the City's consolidated

plan. Such false statements were prepared in City Hall in Woonsocket, Rhode Island and were filed with HUD in Boston, Massachusetts.

## IV. FACTS

8. The Housing and Community Development Act, 42 U.S.C. § 5301, *et seq*., charges HUD with the responsibility of disbursing federal funds to local municipalities for the express purpose, *inter alia,* of promoting provision of adequate stocks of affordable housing and assuring fair access to housing opportunities. As a condition for receipt of federal funds, local municipalities must expressly certify to HUD: 1) that the municipality will ,,to the maximum extent possible, support and promote provision of affordable housing in accordance with the municipality's declared strategies and plans, and 2) that the municipality will evaluate impediments to fair housing opportunities and will develop strategies to overcome those impediments.

9. Beginning in approximately April, 2000 and continuing through at least February 16, 2005 (hereinafter "the false claims period"), Defendants represented to HUD through certain certified statements that the City of Woonsocket, under the stewardship of Mayor Menard, both encouraged and assisted with the development, maintenance and expansion of affordable housing within its municipal borders in compliance with 42 U.S.C. § 5301, *et seq*.

10. The Defendants, under the direction of Mayor Menard, engaged in a pattern and scheme of deception for the purpose of convincing HUD that the Defendants were seriously addressing the housing needs of low and moderate income citizens through support of various affordable housing programs. In fact, since approximately 1995, the Defendants have embraced, implemented and administered a policy of actively discouraging the development of affordable,

subsidized housing within the City in direct opposition to their express representations, assurances, statements and certifications to HUD thereby intending to assure the City's eligibility for federal funds through CDBG and other similar programs.

11. The Defendants made these false representations, assurances, statements and certifications for the purposes of inducing HUD to conclude that the housing needs of City were being addressed in compliance with the national objectives of 24 CFR 570 and, therefore, continue to provide federal housing funds to the City for use on non-housing related expenditures.

12. The Defendants concealed their scheme of deception from both HUD and private citizens through the following methods, among others:

a. By implementing an undisclosed policy of denying access to the documents bearing the Defendant's false representations, statements, assurances and certifications in contravention of their statutory duty and certification to HUD.

b. By falsely representing to HUD and the public that Community Development Block Grant application records would be made available at the local public library when, in fact, no such records were made available;

c. By failing to inform HUD that Defendant's true policy is to discourage the development of affordable housing in the City and by failing to inform HUD that Defendant's true policy is to discourage fair housing opportunities;

d. By replacing written records of zoning deliberations with tape recordings of such deliberations making the identity of speakers, the nature of particular proceedings, and general access to docketed matters unidentifiable; and

e. By failing to properly update the documents submitted to HUD in contravention of the Defendant's statutory obligations and certifications to HUD.

As a result of these methods, HUD officials were unable to learn the true nature of the public housing policies adopted and implemented by Defendants.

**Realtor Learns Defendants' Scheme**

13. Although ongoing since the mid 1990's, the Defendants' deception was not outwardly apparent to Relator until the Spring of 2004 when Mayor Menard verbally expressed her bias against Section 8 housing[1] to Relator's employees. On May 17, 2004 Mayor Menard called the offices of HEDCO in Woonsocket, Rhode Island and demanded that "someone who is not a dummy" meet her at HEDCO owned and operated affordable housing properties located at 136, 142, 156 and 160 Fourth Avenue, Woonsocket, Rhode Island. Defendant Menard spoke with HEDCO employee, Rosie Cruz, manager of HEDCO's Woonsocket properties.

14. On May 17, 2004 at approximately 2:21 p.m., HEDCO employees went to the HEDCO properties located at 136,142, 156 and 160 Fourth Avenue, Woonsocket, Rhode Island in response to Mayor Menard's summons.

15. Shortly thereafter Mayor Menard arrived and immediately upon entering HEDCO's property began yelling, and stated, *"I'll shut all these houses down and take away all the Section 8's"*.

[1] Section 8, or the Housing Choice Voucher Program, is a Federal housing program administered by HUD which provides housing assistance to low-income renters and homeowners in the form of rental subsidies.

16. During her visit, Mayor Menard also declared, *"If I had my way I would get rid of all the Section 8's in the city!"*

17. As a result of this incident, Relator recognized, as a result of his prior experience with CDBG programs in another municipality, that Mayor Menard's stated intentions were contrary to certifications that, of necessity, she would have been required to make to receive CDBG and other funds. He thereupon initiated an inquiry into the policies and practices of the City and Mayor Menard, resulting in discovery of the facts that form the basis of this Complaint.

**The City Failed to Comply with the Conditions for the Receipt of HUD Funds**

18. The City's true housing policy of discouraging affordable housing is in direct contravention of the national objectives of the 24 CFR 570, the Housing and Community Development Act of 1964 and the Fair Housing Act. Federal law requires that municipalities pursue national goals in their communities that, *inter alia*, promote—not discourage—affordable housing for low and moderate income citizens. See 24 CFR 570(a)(2).

19. During the false claims period, the City applied for CDBG and other federal funds.[2] Based on the various representations, assurances and statements made by the City to HUD, the City received a total of approximately fifteen million ($15,000,000) dollars in federal housing funds.

20. A material condition of eligibility for CDGG funds is the City's compliance with 42 U.S.C. § 3601, *et seq.*, including both 42 U.S.C. § 3608(e)(5) which directs the City

[2] Other such programs include the Home Investment Partnership Program, Safety First! Home Repair Cost Assistance, and SAVE Homebuyer Assistance (collectively referred to as "HOME"), and the Emergency Shelter Grant (referred to as "ESG") program to provide emergency housing for homeless citizens.

affirmatively promote the national objectives of the Fair Housing Act and 24 CFR 570 to the maximum extent possible as well as 42 U.S.C. § 5304(b)(5) of the Community Development Act which mandates that the City affirmatively promote fair housing opportunities.

21. More specifically, the City was obligated to conduct an analysis of the impediments to affordable housing within its jurisdiction and take appropriate actions to overcome the effects of any impediments identified though its analysis.

22. In fact, during the False Claims period, the City, acting through the other named Defendants, represented through certified assurances and statements to HUD that it had identified over ninety-eight (98) impediments to the furtherance of fair housing within the City. Notwithstanding the Defendants' deceptive scheme and policy of discouraging affordable housing in the City, Defendants nevertheless represented, assured and certified to HUD that had taken affirmative action to overcome the impediments they identified.

23. In addition, the City, acting through the other named Defendants, falsely certified to HUD throughout the false claims period that all statements, representations and certifications were submitted to HUD for the purpose of public comment pursuant to 24 CFR 570, *et seq.* and were subject to public disclosure.

24. By submitting each application to HUD during the false claims period, the City renewed and incorporated its previous certifications that it had acted in compliance with all requirements of the Fair Housing Act, including specifically the obligation to affirmatively promote fair and affordable housing.

25. Had the Defendants truthfully disclosed that they were, a) pursuing a policy of dissuading and harassing affordable housing providers, b) taking official action to reduce affordable housing, c) block the development of additional affordable housing, and d) in reality

working to diminish fair housing and associated development opportunities, the City would not have been eligible to receive CDBG money or other federal funds.

26. Conversely, if HUD officials were aware that the true policy of Defendants totally contravened the national objectives of the CDBG and other federal aid programs as mandated by statute and regulation, HUD would have been prohibited from disbursing such monies to Defendant City by operation of law.

27. By knowingly submitting to HUD false representations, assurances and statements, Defendants induced and caused HUD to honor the false claims of the Defendants for receipt of CDBG and other similar affordable housing program funds.

**Defendants' Specific False Claims and Assertions Made To HUD To Induce Payment of Money**

28. The following are specific false claims, statements and representations made to HUD. These claims, statements and representations are false because they directly contravene the true policy of the City to discourage advancement of the National Objectives of the CDBG Program and the Fair Housing Act. These are in addition to the statements, certifications, representations and claims made explicitly and implicitly each time Defendant City, acting by and through Mayor Menard, submitted draw downs, invoices, vouchers and other writings specifically requesting funding during the false claim period.

29. On May 15, 2000 and on May 3, 2000 Mayor Menard personally signed applications for federal assistance that accompanied the City's consolidated plan that were with HUD in Boston, Massachusetts. These applications are materially false and contain false certifications, representations and statements required by law as a condition of federal funding.

30. In the Consolidated Plan signed by Mayor Menard on behalf of the City for the purpose of inducing HUD to believe that the City was compliant with the statutory requirements of funding and to induce the City's receipt of HUD funds, the Defendants falsely represented the following:

a. "The City of Woonsocket will continue to advocate for the preservation of affordable housing and assess opportunities to secure additional rental assistance if and when it becomes available…." *Consolidated Plan 2000-2005, City of Woonsocket, Rhode Island, p. 32.*

b. "Due to the City's shortage of affordable rental housing, increasing housing opportunities for families remains a high priority in Woonsocket. Within the rental housing category both small related and large related households received high priority in each income category. This is due to the shortage of family assisted housing available in Woonsocket's current housing stock, as described in the Housing Needs and Homelessness Assessment." *Id. at 38.*

c. "All program records remain available for public access. Major reports and submittals are made available for public review and comment through public notices and hearings in accordance with Woonsocket's Citizen Participation Plan." *Id. at 64.*

d. "Resources from private and non-Federal public sources that are reasonably expected to be made available to address the needs identified in the plan include debt financing, equity, expertise, materials, donations are critical elements of Woonsocket's affordable housing agenda. Major sources of private investment include the Woonsocket Neighborhood Development Corporation…" *Id. at 65.*

e. "Woonsocket is committed to reducing the number of families living in poverty. It is widely recognized that affordable housing must be linked with supportive social services or the cycle of homelessness and poverty will continue." *Consolidated Plan 2000-2005 – Section 7 – amended 6-29-00, City of Woonsocket, RI, p. 4*.

f. The entitlement community "is in full compliance and following detailed citizen participation plan that satisfies the requirements of 24 CFR 91.105." Such requirements include a mandate that records regarding applications to HUD be made public and accessible. Such certification is signed by Defendant Mayor and is dated 5/3/00. The Citizen Participation Plan submitted to HUD states "Citizens, public agencies and other

interested parties will be provided with reasonable and timely access to information and records relating to the jurisdiction's consolidated plan and the jurisdiction's use of assistance under the programs during the preceding five years." *Citizen Participation Plan – amended 9/30/99, p. 5.*

g. "The grant will be conducted and administered in conformity with Title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein.

h. "It (the City) will comply with applicable laws." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

i. "The use of HOME funds for tenant-based rental assistance is an essential element of the participating jurisdiction's consolidated plan for expanding the supply, affordability and availability of decent, safe, sanitary and affordable housing." Such certification is signed by Defendant Mayor and is dated 5/3/00 and is referenced to herein at ¶43 and ¶47.

j, "When completed, copies of the Consolidated Plan, as submitted to HUD, will be sent to the Woonsocket Public Library. The Consolidated Plan will also be available to private citizens upon request." *City of Woonsocket, RI – Consolidated Plan 2000-2005, p. 6.*

k. "The city recognizes its growing minority populations. It pledges that all of its programs will include proactive, positive and inclusionary efforts to promote housing choice in all areas of the city." *City of Woonsocket, RI – Consolidate (sic) Plan 2000-2005 Executive Summary, p. 4.*

l. "Woonsocket seeks to balance assisting those families and individuals most in need of housing with supporting programs that allow for greater homeownership opportunities. To make the city's vision a reality, the city is seeking to make it possible for low-income individuals and families to inhabit safe, decent, and affordable housing. *Id. at 5*.

m. "Woonsocket's housing priorities emphasize the need to use existing structures, whether they are occupied or abandoned. The city takes a variety of approaches to accomplish this goal and apply it to all segments of the city's population. Among its high priorities are to "…provide rental assistance for cost-burdened households and individuals." *Id. at 6.*

n. "A critical element of the city's affordable housing agenda is the use of private resources in debt financing, equity, donations of housing materials and land, and expertise." *Id.*

o. "Within the framework of the national objectives, the City of Woonsocket has set forth a Consolidated Plan that generally identifies the City's Housing and non-housing community development needs and objectives." *Consolidated Plan, 2000-2005, City of Woonsocket, Rhode Island, p. 73.*

31. Defendants filed an action plan effective July 1, 2001 – June 30, 2002. Upon belief, Defendants proffered the same false statements, assurances, representations and certifications as contained the plan filed with HUD for July 1, 2000 – June 30, 2001 and in the action plans submitted in the three years subsequent. Contrary to the certification of Defendant Mayor, no copy of this action plan was available at the Woonsocket Public Library. In addition, HUD has reported that it no longer has a copy of the action plan for the fiscal year July 1, 2001 – June 30, 2002, nor does it have available the Consolidated Action Performance and Evaluation Report for the same period of time, the fiscal year July 1, 2001 – June 30, 2002.

32. Defendants filed an Annual Action Plan effective July 1, 2002 – June 30, 2003 containing the same false representations, assurances and certifications as were contained in the first year action plan for the period July 1 2000 – June 30, 2001 and, upon belief, the plan filed for the fiscal year July 1, 2001 – June 30, 2002 including but not limited to:

a. "We look forward to maximizing the alliance the City has forged with the Department of Housing and Urban Development and other valuable partners. It is through this integration of resources that Woonsocket will achieve the intended public purpose." *Cover letter dated May 9, 2002 addressed to Mr. James H. Barnes, Director, US Department of Housing and Urban Development, which accompanied the Annual Action Plan submitted to HUD.*

b. The following general certification was included in the annual Action Plan for 2002-2003, signed May 3, 2002 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

"The jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard.

c. The following specific CDBG certification was included in the annual Action Plan for 2002-2003, signed May 3, 2002 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

"The City recognizes its growing minority population. It pledges that all of its programs will include proactive, positive, and inclusionary efforts to promote housing choice in all areas of the city. It admits, however, that there are some neighborhoods where these efforts fall short*."* *Id.*

d. "Woonsocket's housing priorities emphasize the need to use existing structures, whether they are occupied or abandoned. The city takes a variety of approaches to accomplish this goal and apply it to all segments of the city's population." *Id. at 6.*

e. In a cover letter dated May 9, 2003 to Mr. James H. Barnes, Director of US Department of Housing and Urban Development Office of Community Planning and Development, 10 Causeway Street, Boston, Massachusetts, Defendant City (over the signature of Deputy Director of Housing and Community Development, Paulette Miller) assured HUD that a "unified vision for community development actions was identified." The letter further falsely confirmed that the city's plan for spending federal money was adopted "keeping in mind the statutory program goals of decent housing, suitable living environment and expanded economic opportunities."

f. The formal Applications for Federal Assistance, HUD-424, were personally executed by Defendant Mayor for and on behalf of Defendant City on May 9, 2003.

g. "The high-priority needs for FY 2003-2004 were identified during the 5-Year Consolidated Plan needs assessment process. They are: affordable housing, neighborhood revitalization through park and commercial building improvements, roadway reconstruction, and improvements to neighborhood facilities. The health, education, and general welfare needs of low to moderate-income residents are also considered priorities." *City of Woonsocket, R.I. Action Plan 2003—2004, p.5.*

h. "Woonsocket will continue to use these programs to meet the needs of extremely low-income households. Due to unpredictable federal funding, Woonsocket will take steps to preserve the existing affordable housing stock throughout the city. Obstacles to preserving existing affordable housing include Section 8 expiring contracts, expiring use developments, and the cost of lead reduction." *Id. at 11*.

i. "There is a continuing need to assist individuals and families who fall below poverty thresholds. Of particular concern within the City are the needs of infirm elderly and poverty-stricken families with children. The City funds numerous programs that seek to alleviate poverty among these subgroups…Therefore, the City will continue to emphasize and support anti-poverty strategies that attempt to prevent homelessness or substandard housing conditions." *Id. at 29.*

j. "In 1996, the city conducted an analysis of impediments to fair housing choice. Since that time, the city has carried out actions to overcome the effects of the identified impediments." *Id. at 33.*

k. "The city has reviewed the policies, procedures, and practices within the city that affect the location, availability, and accessibility of housing and current residential conditions related to fair housing choice." *Id. at 33.*

l. "The jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard."

m. Further, the following specific CDBG certification was included in the Annual Action Plan for 2003-2004, signed May 9, 2003 by Mayor Susan D. Menard on behalf of the City of Woonsocket:

"The housing activities to be undertaken with CDBG, HOME, and ESG funds are consistent with the strategic plan." and "Its consolidated housing and community development plan identifies community development and housing needs and specifies both short-term and long-term community development objectives that provide decent housing, expand economic opportunities primarily for persons of low and moderate income. (See CFR 24 570.2 and CFR 24 part 570)."

n. "The city recognizes its growing minority population. It pledges that all of its programs will include proactive, positive and inclusionary efforts to promote housing choices in all areas of the city." *Id.*

o. "The city has reviewed its policies, practices, procedures within the city that affect the location, availability, and accessibility of housing and current residential conditions related to fair housing choice. Specifically, the city examined the new, relevant demographic information and data; sources of authoritative studies of housing discrimination, lending, and other fair housing issues; methods for obtaining diverse citizen participation in the development, implementation, and evaluation of fair housing planning; and correction actions and solutions." *Id.*

p. "A critical element of the cities affordable housing agenda is the use of private resources in debt financing, equity, donations of housing materials and land, and expertise. Major sources of private investment have included: the Woonsocket Neighborhood Development Corporation, a local community housing development organization; the United Way, which contributes support services for emergency housing and homeless support services; local banks; and volunteers." *Id. at 7.*

33. Defendants filed an Annual Action Plan and Application for Federal Assistance effective July 1, 2004 – June 30, 2005 containing the same false representations, assurances and certifications as well as significant information as to such false information supplied to HUD:

a. In a cover letter dated May 11, 2004 to Robert Paquin, Director of the Office of Community Planning and Development, 10 Causeway Street, Boston, Massachusetts, Defendant City (over the signature of Deputy Director of Housing and Community Development, Paulette Miller) assured HUD that a "unified vision for community development actions was identified." The letter further falsely confirmed that the city's plan for spending federal money was adopted "keeping in mind the statutory program goals of decent housing, suitable living environment and expanded economic opportunities." As in similar letters written in each of the prior three years, this letter avers that the "…Plan will be continually reviewed, measured and amended as necessary."

b. The formal Applications for Federal Assistance, HUD-424, were personally executed by Defendant Mayor for and on behalf of Defendant City.

c. "Mayor Menard, as the chief elected official for the City, is entrusted with the ultimate responsibility for the carrying out of the action plan. She has designated the Development Division as the lead agency to administer the CDBG, HOME and ESG funds…" *City of Woonsocket, RI. Action Plan 2004-2005, p. 11.*

d. Again, in 2004, Defendants give the same assurances to HUD as they did in 2000, 2001, 2002, and 2003 regarding their falsely promised efforts to cultivate assisted housing. "As identified in consultation with the Woonsocket Housing Authority, priority needs for public housing include…increased assisted housing choices." Id. at 30.

f. Defendants analyze impediments to fair housing and assert that they have "reviewed the policies, procedures and practices within the city that the affect the location, availability and accessibility of housing and current residential conditions related to fair housing choice." They disclose no findings of city policies that affect fair housing opportunities. Id. at 34.

g. Defendant City, as in years previous, again certifies falsely to the facts allegedly underlying compliance with federal requirements as described herein.. Such certifications are signed personally by Defendant Mayor, Susan Menard, and are dated May 10, 2004.

**The True Policies and Practices of Defendants**

34. Despite the Defendants' continued representations and assertions to HUD to the cumulative and continuing effect that the City recognized the need for additional low and moderate income subsidized housing referenced herein and intended to undertake and support efforts to provide more such housing, the truth is that since 1995, the City of Woonsocket, spearheaded under the leadership of Mayor Menard, has adopted and implemented policies and practices attempting to limit such housing in Woonsocket, and instead, promote gentrification of the area at the expense of such housing.

35. Despite representations and assertions to HUD that the City recognized limited affordable housing opportunities and would take "steps" to preserve existing affordable housing stock throughout the city, such "steps" were not undertaken.

36. Despite representations and assertions to HUD that Woonsocket would continue to advocate for the preservation of affordable, subsidized housing, the City has, in fact,

undertaken certain policies and actions which have, instead, reduced or limited the number of units of affordable housing within the city.

37. Despite representations and assertions to HUD that the City had updated its Zoning Ordinance to allow for mixed-use residential zones which promote affordability and convenience to renters and the implication inherent therein that the City would utilize this tool to support and promote affordable, including subsidized, housing, the City has, in fact, in more than one instance, acted to limit development of additional affordable, subsidized housing using zoning regulation as its tool.

38. Despite representations and assertions to HUD that the City seeks to follow a policy of inclusionary efforts to" promote housing choice in all areas of the city" the City, has, in fact, by its actions, acted in contravention to this assertion.

39. Despite representations and assertions to HUD that the City "seeks to balance assisting those families and individuals most in need of housing with supporting programs that allow for greater homeownership opportunities…to inhabit safe, decent, and affordable housing…provide rental assistance for cost-burdened households and individuals". *City of Woonsocket, RI –Consolidated Plan 2000-2005 Executive Summary, p.5-6.* Defendant City has not fulfilled its pledge and has failed to inform HUD of its failure.

40. Despite representations and assertions to HUD in its Consolidated Five Year Plan and in each of its annual Action Plans beginning with the plan filed effective July 1, 2000 and each July 1 thereafter and in contravention of each CAPERs (yearly self evaluation of performance) filed subsequent, the City has not taken "steps to preserve the existing affordable housing stock throughout the City," but has, instead, taken steps that served to reduce, diminish,

and decrease the actual number of available units of affordable and subsidized housing stock in the City.

41. Despite the City's statement to HUD in its Consolidated Plan, previously referenced, that the public would have access to the documents submitted to HUD, Defendants have failed to make such documents available to private citizens.

42. Thus, Defendants' continued statements, assurances and certifications that they have and will support the national objectives of the CDBG program and other federal aid programs are false and were intended to obtain monies from HUD to which the City would not otherwise be entitled.

43. Defendants' true policy was outlined on January 30, 2004 by, Woonsocket's Director of Human Services, Owen T. Bebeau, in a report to the Woonsocket City Council. Owen Bebeau is an appointee of Mayor Menard. Mayor Menard is the immediate supervisor of Owen Bebeau. Such report failed to disclose that the City had, in fact, made certifications, representations and assurances contrary to the true policy of Woonsocket in order to obtain federal funding.

44. Reacting to a preliminary draft of a report prepared by Rhode Island Housing and Mortgage Finance Corporation (hereinafter "RIHMFC") – Rhode Island's state housing agency – to the effect that the City had lost the distinction of having the greatest number of low and moderate income housing units in the state, Bebeau credited manifestation of this change to the moratorium Mayor Menard had put in place against such affordable, subsidized housing beginning upon her election in 1995.

45. Mayor Menard did, in fact, impose such a moratorium. She, however, failed to notify HUD of such a moratorium at the same time she certified that the City had adopted a policy of promoting affordable housing and compliance with the Fair Housing Act.

46. Crowing about the City's "accomplishment" of reducing the low and moderate income housing stock, Bebeau referred to the "stance" of Mayor Menard aimed at restricting the growth of subsidized housing. The "moratorium" in such housing was undertaken because the City had allegedly done "more than its share of meeting the burden of providing affordable housing."

47. At no time has the City informed HUD of its policy to restrict and reduce affordable, subsidized housing for low and moderate income residents. Such a policy is in direct contravention of the national objectives of HUD and of the CDBG program—objectives Mayor Menard certified the City was pursuing and implementing as part of the applications to receive federal funds from HUD. Moreover, the significance of the statement by Bebeau of the true policy of the Defendants in contrast to submissions to HUD would not have been ascertainable because of the inability of citizens to review documents submitted to HUD in comparison to the municipal policy statement annunciated by Bebeau on behalf of the City. Such inability has been caused by Defendants' failure to file such documents at the Woonsocket Public Library as promised to HUD, by Defendants' refusal to release such documents as demonstrated by the response to such request by counsel for Relator and by the City's change in policy with respect to filing and storing of Zoning Board Records.

48. In light of Defendants' often repeated statements of support of affordable, subsidized housing in accord with the national objective, Owen Bebeau explained Mayor Menard's policy: "Woonsocket has reached its peak in regards to these units and her (Mayor

Menard's) administration would no longer support projects" that would increase affordable, subsidized housing.

49. The memorandum written by Owen Bebeau to the Woonsocket City Council was requested by the council members when a Providence, Rhode Island developer came forth with a proposal to build 160 apartment units in late 2003 which would have utilized a portion of a parcel of city-owned property. Again, contrary to its promises to HUD to encourage housing development, and in keeping with its true policy, the city council discouraged the apartment construction plan, and instead, sold a parcel of the City-owned land to Wal-Mart Real Estate Business Trust, permitting expansion of an existing Wal-Mart store on the same property.

**Frustration of the Not-For-Profit Affordable Housing Efforts**

50. A thorn in the side of Mayor Menard in her efforts to frustrate development of affordable housing in her poor city, the Woonsocket Neighborhood Development Corporation (hereinafter "NDC") is a private, not-for-profit entity dedicated to developing and operating affordable housing within the City in keeping with the national objectives.

51. Since the founding of NDC in the early 1990's Mayor Menard has tried to hinder the corporation's effort to provide affordable housing in Woonsocket. The very first project NDC undertook was in the Mayor's neighborhood. At that time, the Mayor was a councilwoman. Then Councilwoman Menard opposed the project on the basis that affordable housing should not be built in a "nice" neighborhood. She used the prospect of NDC's project for affordable housing as a political issue to assist her in obtaining name recognition and political stock.

52. By the time NDC was beginning Phase 2 of its successful Constitution Hill project in 1995, Defendant Mayor had assumed office as the city's chief executive. The Constitution Hill project is comprised of approximately one-third Section 8 voucher tenants wherein the Woonsocket Housing Authority, using HUD funds, subsidizes rents for low and moderate income citizens. Defendant Mayor attempted to block Phase 2 of the Constitution Hill project and asked Richard Godfrey, Director of the state housing agency, RIHMFC how she might do so and how he might assist her.

53. NDC next undertook a Home Ownership Development program by creation of a land subdivision. This process began in the late 1990's. From the beginning the City, through the policies spearheaded by Mayor Menard, created obstacles to the creation of additional affordable, subsidized housing opportunities. Among those was a claim that a zoning exception had expired. The NDC sued and its case was remanded by the Rhode Island Superior Court to the city's zoning authority. Again the City balked and a second lawsuit was filed in Superior Court. Finally, the Court overruled the zoning authorities and allowed the NDC affordable housing project to proceed. Still intent on interfering with the project, Mayor Menard wrote one or more letters continuing to threaten the project. One such letter threatened to deny water service to the project. These letters were written in 2001 just before subdivision construction began and during the pendency of the City's consolidated plan.

**<u>Entrepreneurial Builders of New, Affordable, Subsidized Housing Need Not Apply</u>**

54. Woonsocket is a densely packed city of tenements and neighborhood storefronts. Opportunities to construct affordable housing on relatively large tracts of land are not often presented.

55. As early as June, 1999, the City was applying its double standards in furtherance of its then unstated policy with respect to affordable, subsidized housing. Excel Management, Inc. applicant, and City of Woonsocket, as owner, requested a zoning variance for renovation/construction of a small four unit structure consisting of three bedroom units, to be funded by a program of the City. During the meeting of the Zoning Board to examine the application, it was repeatedly affirmed to the Board by the applicant (who had previously successfully completed another renovation project funded by the City) that the building units would be "affordable" but not "subsidized" housing, and would not accept Section 8 applicants. Said variance was granted, based on the inference (but without stipulations) that the building would not become subsidized housing within the meaning herein.

56. Another such opportunity was presented in late 2003. Rather than encouragement in constructing affordable housing in the putative Diamond Hill Road project, the potential developer was told the City preferred Wal-Mart to troublesome poor people. Zoning was the defensive club used to beat off the affordable housing proposals so offensive to Defendants. As heinous as this conduct might be, the City's actions did not constitute the first time an opportunity to provide significant numbers of affordable housing units in furtherance of its promises to HUD had been intentionally squandered through the predatory zoning practices specifically decried in Defendants' statements to HUD.

57. In May, 2001—even as Woonsocket's second annual action plan was being submitted to HUD—The Aspen Group of North Reading, Massachusetts and Mill Woonsocket Associates Limited Partnership of Chestnut Hill, Massachusetts were anxious to build two hundred fifty-two (252) apartment units on former industrial property located on Mill Street, Woonsocket. The project was to be known as River Bend. In order to undertake such

construction a use variance and a dimensional variance were required.

58. Rather than viewing such a proposal as a unique and rare opportunity to fulfill its promises, assurances and certifications to HUD, Defendants immediately began to plot ways to insure fulfillment of Defendants' policy of limiting subsidized housing as explained by Owen Bebeau.

59. Accordingly, on May 29, 2001, following advocacy by the administration of Mayor Menard, the Woonsocket Zoning Board of Appeals, in Decision #4902, granted the use and dimensional variances requested subject to several significant stipulations.

60. First, the City required a stipulation to be implemented by a covenant or deed restriction to the effect that the project could never be used for federally subsidized housing.

61. Next, despite Defendants' having submitted its Comprehensive Housing Affordability Study to HUD as part of the consolidated plan, despite that plan finding a need for housing units for families needing multiple bedrooms and despite certifying specifically to HUD that local public policy would operate consistent what that plan, Defendants took action to require that River Bend would not be able to serve such needy families. An additional stipulation of the River Bend Decision #4902 required:

"Stipulation 3: A minimum of twenty percent (20%) of the total number of units must be one-bedroom units."

62. Finally, the Zoning Board of Review, acting on recommendation of the administration of Defendant Mayor, eliminated any hope that large families would find homes at River Bend:

"Stipulation 5: The development can have only one-bedroom and two-bedroom units."

63. Just one month before the River Bend project was considered by the Zoning Board of Appeals another potential apartment developer ran into opposition from the city administration based upon speculation that economic distress might force the developer to turn to subsidies. Andola Fibres, Ltd., of Kingston, Ontario, Canada applied to build 48 apartments in four twelve unit buildings on a 4.7 acre wedge of land bounded by Diamond Hill Road and Fulton Street.

64. City Planning Director Joel D. Mathews, whose department is charged with implementation of the City's comprehensive and action plans, stated on April 9, 2001 that the city administration opposed the construction of these apartments because city officials feared it would become a subsidized housing tract.

65. Planning Director Mathews on the same day acknowledged that the developer had not proposed building subsidized housing but contended that "the ability to rent it or other failures in the development process" would result in subsidized housing.

66. Despite being assigned the task, as a department director, of implementing the City's implementation of the national housing objectives in exchange for receipt of HUD cash, Matthews then asserted that Mayor Menard's administration is opposed to subsidized housing "in principle."

67. When Andola Fibres, Ltd.'s application was finally approved by the Zoning Board on June 11, 2001, stipulations required that the Grant **"be subject to the recording in the Woonsocket Registry of Deeds before construction begins, of a covenant/restriction that would prevent this development from becoming federally subsidized housing at any time in the future; said covenant/restriction shall be in the form as finally approved by the Administration and the Applicant"** (emphasis added).

68. By contrast, developers proposing luxury housing in Woonsocket are quickly embraced and their projects are endorsed by Defendants without hesitation. For example, in October, 2002, developer Constitution Holding, Inc., a Rhode Island corporation, approached the Woonsocket Council for a zone change that would allow conversion of the former Bancroft Sporting Goods Co. into approximately forty-five (45) "high end" condominiums. A zone change is a departure from city development policy even more radical than the variances sought by the developers of River Bend. The application was filed two years into implementation of Defendant City's Consolidated Plan.

**Defendants' Fight to Remove Tax Incentives to Subsidized Housing**

69. Just as the purpose of Mayor Menard's harassing and threatening visit to Relator's Fourth Avenue properties was to dissuade Relator from continuing to provide subsidized housing opportunities to Woonsocket's low and moderate income citizens, so too was her attack on tax policies favorable to subsidized housing providers.

70. In the midst of the Rhode Island General Assembly's 2003 legislative session, Mayor Menard undertook her second yearly attempt to repeal favorable tax treatment for owners/entrepreneurs if they had invested in "substantial rehabilitation" of housing units made available for rent to subsidized tenants.

71. The state statute, RIGL 44-5-13.11, provides that owners who have rehabilitated slum properties would pay property taxes restricted to eight (8) percent of the prior year's gross rent receipts. Implementation of the statute by the City would further its goals stated in the consolidated plan and affirmed yearly in the City's action plan submitted to HUD in exchange for community development funding.

72. Rather than take steps to encourage development of additional subsidized housing, Defendants sought to change the law without notice to HUD regarding its true policy toward affordable housing.

73. Over a period of two years, in attempting to eliminate the tax incentive for rehabilitation of housing, Defendants argued that Woonsocket was already providing sufficient housing and should be required to do no more. Such an argument is directly contrary to the statements, assurances and certifications made to HUD.

74. In the Spring of 2002, Defendants sought to overturn the incentive tax policy toward housing rehabilitators by judicial action. The City filed an action in Rhode Island Superior Court to challenge two housing partnerships that had claimed the tax incentive for ninety-one (91) housing units in the Constitution Hill development. The partnerships—named Securing the Future and Reclaiming the Vision-- are affiliated with Woonsocket Neighborhood Development Corporation, the much disfavored not-for-profit entity from which Defendants had previously withdrawn financial support.

75. Not surprisingly, the anti-housing effort of Defendants was rebuffed by the Court. The Court found for the partnerships and ordered the city to repay $45,000 the Court concluded had been unlawfully collected by the City.

76. The efforts of Defendants in 2002 and in 2003 to remove tax incentives for creation of affordable housing in Woonsocket contrary to statements, assurances and certifications made to HUD were the continuation of the anti-affordable, subsidized housing policy adopted by Mayor Menard when she assumed office in 1995—almost five years before Defendants filed their sham consolidated plan with HUD Boston officials.

77. In May, 1997 Mayor Menard, as part of the City's budget, undertook an

elimination of homestead tax exemptions previously made available to properties with ten (10) or more housing units. Typically, such properties would consist of, in part, subsidized housing.

78. The elimination of such tax exemptions would have the effect of increasing tax assessments—and thus taxes—by twenty-five (25) percent.

## **Records of Defendant Representations to HUD Not Made Public; Evidence of False Representations to HUD Made Inaccessible**.

79. On July 20, 2004 counsel for Relator wrote to Defendant Mayor asking, *inter alia*, for: **"Any submission, endorsement, approval, communication submitted, directly or indirectly, to any federal or state agency, signed or authorized by you, in which Section 8 housing subsidies are addressed, sought, rejected, approved or mentioned."**

80. Defendant City's Consolidated Plan and subsequent action plans signed by Defendant Mayor and submitted to the Boston offices of HUD, are clearly and unambiguously are included in this request. The Consolidated Plan and the Action Plans repeatedly and continuously refer to Section 8 and other housing subsidy programs, as do the CAPERs.

81. In its Citizen Participation Plan submitted to HUD as certified to by Defendant Mayor, Defendants represented: **"Citizens, public agencies and other interested parties will be provided with reasonable and timely access to information and records relating to the jurisdiction's consolidated plan and the jurisdiction's use of assistance under the programs during the preceding five years."** *Citizen Participation Plan – amended 9/30/99, p. 5.*

82. In a letter dated July 29, 2004, Woonsocket City Solicitor Joseph Carroll, acting as legal counsel for Mayor Menard, responded to the specific document request herein as follows: **"Any such document, if it exists, would be within the custody of the City Clerk or,**

**alternatively, would be exempt under the previously stated statute. Please submit Request #4 to the appropriate department."**

83. Thus, in total contravention of representations made and certified by Mayor Menard to HUD that records submitted to HUD would be public, her legal representative—Carroll—obfuscated and demurred when asked for those records. Instead of providing the records that now appear so embarrassing and damaging to Defendants in light of documentation of their true conduct, Defendant Mayor's legal representative suggested that such records might be exempt from disclosure and directed Relator's counsel to a city department without responsibility for the submission of documents to HUD.

84. Such obfuscation and demurrer on the behalf of the legal representative of Defendant Mayor, in contravention of the statements, assurances and certifications to HUD, were for the purpose of hiding, secreting and keeping from public view the false nature of those same statements, assurances and certifications made to HUD.

85. In fact, in the preparation of this complaint Relator's counsel was forced to obtain documents directly, as filed, in the Boston office of HUD. It was only after city officials learned that Relator's counsel was obtaining records from HUD's Boston office that they disingenuously offered to provide access to their files as required by law and as represented to HUD.

86. Despite assurances to HUD that the consolidated plan and yearly action plans would be made available to the public for viewing at the Woonsocket Harris Public Library, such is not the case. Librarians at the Woonsocket Harris Public Library have no recollection of ever having received any such documents. The catalog system of the Woonsocket Harris Public Library contains no references to such documents. Moreover, other potential public document storage facilities to which such documents may have been moved or filed have no record of such

documents or receipt of such documents. These include the Rhode Island State Library, the Rhode Island Archives maintained by the Rhode Island Secretary of State and the Providence Public Library.

87. An equal impediment to citizen access to the full panoply of Woonsocket housing policy was elimination of the physical paper records of the Zoning Board of Review proceedings and replacement with tape recordings of meetings. Other than meeting agendas, there is no index to such recordings and speakers generally are not identified on such tapes. Thus, persons who might wish examine discussions in board proceedings for the purpose of comparing actual city housing policy with that professed in documents submitted to HUD (or for any other purpose) are required to undertake a laborious task of listening to full discussions in lengthy meetings without the ability to discern one speaker from another. Thus it appears that the Defendants have conspired to preclude the public from access and review of documents both directly and tangentially related to housing matters.

## **Damage to the Federal Government**

88. As a result of Woonsocket's false certifications and submission of false supporting assurances and representations, and as a result of seeking payments based on the false premise that it had complied with the various fair housing obligations it had undertaken, Woonsocket has improperly received more than fifteen million ($15,000,000) dollars in federal funds.

89. As a result of Woonsocket's false certifications and submission of false supporting assurances and representations, and as a result of seeking payments based on the false premise that it had sought to and had, in fact, advanced the National Objectives of the

Community Development Block Grant program, Woonsocket has improperly received more than fifteen million ($15,000,000) dollars in federal funds.

V. STATEMENT OF CLAIMS

**False Claims Act**

90. Plaintiff repeats and realleges each of the proceeding allegations as if fully stated herein.

91. This is a *Qui Tam* civil action brought by Gordon F.B. Ondis and the government of the United States to recover treble damages and civil penalties under 31 U.S.C. § 3729(a)(1-2) of the False Claims Act.

92. Defendants have violated 31 U.S.C. § 3729(a)(1-2) of the False Claims Act on multiple occasions on divers dates between January 1, 2000 and February, 2005 in that they have willfully and intentionally :

a) submitted false and/or fraudulent claims for payment to an officer and employee of the United States government; and

b) made, used or caused to be made or used, a false record or statement which caused a false or fraudulent claim to be paid by the Government.

93. Each time Defendants submitted a request for payment, drawdown, invoice, certification or representation Defendants committed a separate violation of the False Claims Act.

94. In reliance on false claims, and on supporting representations, certifications, requests, invoices and drawdowns the United States Government, by and through the Department of Housing and Urban Development, awarded grants and other Federal funds to Defendant City of Woonsocket, Rhode Island.

95. As a proximate result of the conduct of Defendants the United States Government has been damaged in an amount in excess of FIFTEEN MILLION DOLLARS, exclusive of

interest, multiple damages, fees, costs and expenses.

96. Relator F.B. Ondis is a private person with direct and independent knowledge of the allegations of this complaint who has brought this action pursuant to 31 U.S.C § 3730(b) on behalf of himself and the United States Government.

WHEREFORE, Relator F.B. Ondis respectfully requests this Court to award the following damages to the following parties and against Defendants as follows:

To the UNITED STATES GOVERNMENT:

a) three times the amount of actual damages the United States Government has sustained as a result of the fraudulent practices of Defendants;

b) a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which each defendant submitted to the United States Government;

c) prejudgment interest; and

d) all costs of this action.

To RELATOR ONDIS:

a) 30% of the proceeds of this action, pursuant to 31 USC § 3730(d);

b) reimbursement of the expenses which Relator incurred in connection with this action;

c) award of reasonable attorneys' fees;

d) costs and disbursements  this action;

e) such other relief as the Court deems lawful and just.

**Jury Demand**

Plaintiff seeks jury trial on all issues so triable.

Respectfully Submitted,

United States of America, *ex rel*
GORDON F.B. ONDIS
By his Attorneys,

/s/ David C. Clarke
David C. Clarke, Esq. (#6376)
BLAIS CUNNINGHAM
& CROWE CHESTER
150 Main Street, P.O. Box 1325
Pawtucket, Rhode Island 02862
(401) 723-1122 (tel)
(401) 726-6140 (fax)
dclarke@blaislaw.com

/s/ Leon A. Blais
Leon A. Blais, Esq.,
by *Pro Hac Vice Admission*
BLAIS AND PARENT
20 Cabot Blvd.
Suite 300
Mansfield, MA 02048
508 618-1280
866 329-6175 fax
LBlais@BlaisParent.com