Craig Gurian, Esq. (CG 6405)
Attorney for Plaintiff Relator
299 Broadway, Suite 1820
New York, New York 10007
(212) 346-7600

JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANTI-DISCRIMINATION CENTER OF METRO NEW YORK, INC., | : | Civil Action No. 06 CV 2860 |
| | : | **FILED UNDER SEAL** |
| Plaintiffs, | : | **DO NOT PLACE ON PACER** |
| -against- | : | **DO NOT PLACE IN PRESS BOX** |
| WESTCHESTER COUNTY, NEW YORK, | : | |
| Defendant. | : | |

FILED
U.S. DISTRICT COURT
2006 MAR 12 PM 2:22
S.D. OF N.Y.

**False Claims Act Complaint and Demand for Jury Trial**

INTRODUCTION

1. Defendant Westchester County, a recipient of Community Development Block Grant and other federal funds, was required to comply with the provisions of the Fair Housing Act, 42 U.S.C. §3601 *et seq.*, including the requirement of 42 U.S.C. §3608(e)(5) that it affirmatively further fair housing to the maximum extent possible. It was also obligated to comply with the requirements of the Community Development Act, including the affirmatively furthering fair housing requirements of Section 104(b)(2) thereof [42 U.S.C. § 5304(b)(2)].

2. As an applicant for these funds, Westchester County was required to certify -- as a material condition of its and its consortium partners' eligibility to receiving such funds -- that it was furthering, and would affirmatively further, fair housing. Included in these requirements

was the obligation to conduct an analysis of the impediments to fair housing choice within its jurisdiction, and the obligation to take appropriate actions to overcome the effects of any impediments identified through that analysis. On multiple occasions within the preceding six years, Westchester County certified that it was in compliance with these requirements.

3. In fact, Westchester County had failed to conduct a meaningful analysis of impediments (the analysis contained within defendants' 2004-2008 Consolidated Plan, for example, does not even mention even once either the phrase "housing discrimination" or the phrase "housing segregation"); and, to the extent that impediments identified in the analysis do bear on fair housing choice, Westchester County failed over many years to take appropriate steps to overcome such impediments.

4. Accordingly, Westchester County's certifications were false. Through those false certifications, and through claims for payment or payment or approval which falsely presented Westchester County as being in compliance with its obligations under the Fair Housing Act, Community Development Act, and its previously-made certifications, Westchester County has improperly received more than $45 million in federal funds.

## JURISDICTION AND VENUE

5. This action arises under the 31 U.S.C. §§ 3729 *et seq.* ("the False Claims Act"). This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3730(b) and 3732(a). This Court also has jurisdiction pursuant to 28 US.C. §§ 1331 and 1345.

6. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the conduct proscribed by the False Claims Act and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), because the acts and omissions

complained of herein occurred in this District, and because, at all times material and relevant, defendant resided in and transacted business in this District.

7. As required by 31 U.S.C. § 3130 (b)(2), Plaintiff Relator has provided to the Attorney General and to the United States Attorney for the Southern District of New York a statement of material evidence and information that Plaintiff Relator possesses regarding this complaint. Because the statement includes attorney-client communications and work product of Plaintiff Relator's counsel, and was submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation, the Plaintiff Relator understands this statement to be confidential.

## PARTIES

8. Plaintiff Relator Anti-Discrimination Center of Metro New York, Inc. (the "Center") is a not-for-profit New York corporation that is tax exempt pursuant to Section 501(c) of the Internal Revenue Code. It works, collaboratively and across disciplines, to prevent and remedy discrimination and expand civil rights protections in housing, employment, education and public accommodations through advocacy, litigation, education, outreach, research, and monitoring. The Center believes that this work needs to proceed across group lines and across geographical lines. It believes that there are important ways in which all those in the New York region need to identify ourselves as all part of one community. Like any corporation, the Center is only able to act through its officers, directors, agents, and employees.

9. The United States of America ("United States") provides housing-related funding to a variety of state and local governmental entities. Receipt of the funds relevant to this action is

contingent on certifications that the recipient has and will meet a variety of fair housing obligations.

10. Defendant Westchester County ("Westchester") is a municipal corporation as defined by the laws of the State of New York.

## FACTS

**I. Background**

11. There are 45 towns, villages, cities, or other municipal entities (collectively, "municipalities" in defendant Westchester).

12. With the exception of Mount Pleasant, Mount Vernon, New Rochelle, White Plains, and Yonkers, the remaining municipalities ("participating municipalities") are part of the Westchester Urban County Consortium ("Consortium").

13. Throughout the period April 1, 2000 to the present (the "false claims period"), Westchester has been strongly residentially segregated by race and national origin.

14. Based on 2000 Census Bureau data, for example, 40% of the municipalities in Westchester have populations which are one percent Black or less, and more than 60% have populations which are three percent Black or less.

15. In contrast, Mt. Vernon's population is 58% Black and 10% Hispanic; Peekskill's is 34% Black and 22% Hispanic; New Rochelle's is 19% Black and 20% Hispanic; and Yonkers' is 15% Black and 26% Hispanic.

16. Westchester was aware of the housing segregation reflected in these data throughout the false claims period.

17. Throughout the false claims period, Westchester was aware that the supply of affordable housing was inadequate to its needs.

18. Throughout the false claims period, Westchester was aware that there was strong resistance in many participating municipalities to the creation of affordable housing units.

19. Throughout the false claims period, Westchester was aware that the unavailability of affordable housing contributed to the continued pattern of racial segregation in the county.

**II. Seeking and Receiving Federal Funding**

20. Throughout the false claims period, Westchester applied each year for federal funds on behalf of itself and the participating municipalities. These applications for federal funding, included, but were not limited to, applications for Community Development Block Grant ("CDBG") funds and Housing Opportunity Made Equal ("HOME") funds.

21. A material requirement of eligibility for such funds was Westchester's certification, on behalf of itself and the participating municipalities, that it and the participating municipalities would affirmatively furthering fair housing and comply with each and all of the provisions of the Fair Housing Act.

22. More specifically, Westchester represented that it would conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and those actions.

23. In submitting each application, Westchester renewed and incorporated the previous certifications that it had acted in compliance with the requirements set out in paragraphs 21 and 22, above.

24. In addition, Westchester obligated itself to comply with all provisions of the Fair Housing Act, including the obligation to affirmatively further fair housing; and with analogous requirements of the CDBG program; and obligated itself to make certain that participating municipalities themselves were complying with all provisions of the Fair Housing Act, including the obligation to affirmatively further fair housing.

25. Westchester was aware of each and all of the requirements described in paragraphs 21-24, above, each time it submitted an application for federal funding during the false claims period, and was likewise aware of its authority and responsibility to refuse to disburse funds in support of any participating municipality that was not affirmatively furthering fair housing within its own jurisdiction.

26. Westchester made claims for payment of grant funds from the United States throughout the false claims period.

27. These claims included explicit and/or implicit representations that Westchester had and was complying with the obligations set forth in paragraphs 21-24, above, obligations of which it was aware each time it made such claims for payment.

28. Indeed, as the Center learned from documents provided directly to it by Westchester, Westchester knew that it was "prohibited from expending [CDBG] funding for activities in or in support of any local government that does not affirmatively further fair housing within its own jurisdiction or that impedes the county's action to comply with its fair housing certifications."

29. As the Center further learned from documents provided directly to it by Westchester, Westchester knew that it had the authority and responsibility to direct participating municipalities to do that what is necessary – as determined by Westchester – to affirmatively further fair housing.

30. When Westchester made its certifications and claims for payments during the false claims period, it knew the certifications were false and that the claims for payment based on supposed compliance with its obligations were false; it also knew that it had no intention to comply with the requirements with which it had sworn to comply.

31. Westchester concealed its failure to comply from the United States throughout the false claims period.

**III. Failure to Conduct an Analysis of Fair Housing Impediments**

32. The "Fair Housing Plan" that Westchester prepared as part of its 2004-2008 Consolidated Plan illustrates and confirms Westchester's stark failure to conduct anything resembling an actual fair housing impediments analysis.

33. Neither the phrase "housing discrimination" nor the phrase "housing segregation" even *appears* in the "analysis of impediments," and Westchester provided literally no analysis of the role – current or historical – of either phenomenon in relation to existing impediments to fair housing.

34. These material omissions were made in the face of the fact that Westchester knew or should have known of the current and historic role of housing discrimination – public and private – and housing segregation in creating and perpetuating impediments to fair housing.

35. Westchester itself characterized its "analysis of impediments" as "an evaluation of the needs for handicapped persons[,] larger/smaller families, extended families, and tenure opportunities when planning their future development."

36. Westchester made absolutely no reference to its "analysis of impediments" being an evaluation of anything have to do with the housing needs of different racial or ethnic groups.

37. Westchester, through its employees, acknowledged to the Center (directly) that its demographic analysis for fair housing impediments analysis purposes did not encompass race, but only examined housing needs based on income.

38. Westchester, through its employees, explicitly stated to the Center (directly) that it sees discrimination as a problem of income discrimination, not racial discrimination.

39. Westchester's identification of impediments to fair housing was entirely passive and reactive. Its policy, as admitted to the Center (directly) by its employees, was not to treat as an impediment anything that was not brought to defendant's attention at the instigation of a consortium partner or other non-County entity. In other words, defendant was unprepared to engage in any independent analysis or exploration of impediments, and in fact did not engage in any independent analysis or exploration of impediments.

40. Westchester did not include as part of its "analysis" any account of its own role prior to and during the false claims period in failing to affirmatively further fair housing, or in failing to see that municipalities, including participating municipalities, affirmatively furthered fair housing.

41. In the period January 1, 1996 through and including June 30, 2005, the Center has learned -- from material disclosed only to the Center by Westchester (and not publicly disclosed) -- that Westchester did not perform, or cause to be performed, any investigation or analysis of regional housing need which treated (or even considered the possibility of treating) all of some of Westchester County as part of a regional housing market that includes all or some of New York City.

42. In the period January 1, 1996 through and including June 30, 2005, the Center has learned -- from material disclosed only to the Center by Westchester (and not publicly disclosed)

-- that Westchester did not perform, or cause to be performed, any investigation or analysis of regional housing need which considered the possibility that it was necessary for participating municipalities, in connection with the obligation of those municipalities to create or modify zoning ordinances to meet regional housing need, to consider the need for affordable housing of people living in New York City.

43. The extent of Westchester's failure to engage in a process of analysis is reflected in the extraordinary admission Westchester made, through its employees, to the Center (directly) that the reason that the supposed analysis of impediments to fair housing did not refer to housing discrimination was because the Consortium does not include Yonkers. The admission represents clear evidence that Westchester neither understands housing discrimination to be a problem throughout the County, nor understands how the demographic of different parts of the County and region are interactive.

**IV. Failure to take appropriate steps to affirmatively further fair housing or to overcome the impediments identified**

44. Westchester did not take appropriate steps, and, because of Westchester policy, could not have taken appropriate steps, to further fair housing.

45. Westchester did not take appropriate steps to overcome the barriers to fair housing that were identified in its analysis (barriers to affordable housing were discussed by Westchester, though not identified by Westchester as operating as barriers to fair housing). Though lack of affordable housing hurts people of all races and national origin, its absence in the participating municipalities has a disparate impact on Blacks and Hispanics (as those terms are used by the Census Bureau), and the barriers operate to perpetuate segregation.

46. Westchester did not take appropriate steps to overcome the barriers to fair housing that would have been identified in its analysis had its analysis been performed as contemplated by the relevant statutes and regulations. These include barriers such as housing discrimination, housing segregation, and race- and national origin-based stereotyping, The fact that discrimination, segregation, and stereotyping can act as inhibitions on the residential preferences of prospective minority residents, and can also distort the residential preferences of Whites, was neither dealt with or ever considered by Westchester.

47. Westchester, through its employees, admitted to the Center (directly) that Westchester did not *and would not as a matter of policy* monitor the effort (or lack of effort) of participating municipalities in respect to affirmatively furthering fair housing.

48. In the period January 1, 1996 through and including June 30, 2005, the Center has learned -- from material disclosed only to the Center by Westchester (and not publicly disclosed) -- that Westchester never informed, suggested, or referenced the possibility to any participating municipality that Westchester might withhold federal funds from such municipality if that municipality did not take steps to affirmatively further fair housing.

49. In fact, Westchester, through its employees, admitted to the Center (directly) that Westchester's policy has never been to criticize participating municipalities for their failure to meet their responsibilities in the context of either of affirmatively further fair housing or in respect to providing affordable housing.

50. Throughout the false claims period, Westchester did not withhold federal funds from any participating municipality in connection with a failure to take steps to affirmatively further fair housing, including the failure to take steps to create affordable housing, and Westchester,

through its employees, admitted to the Center (directly) that even the threat of such withholding of funds was not something that Westchester would do.

51. Westchester, through its employees, admitted to the Center (directly) that it has a hands-off policy in respect to how participating municipalities plan, and stated that Westchester's message to participating municipalities is that each participating municipality knows its municipality best.

52. Westchester, through its employees, admitted to the Center (directly) that it permits (and does not object to) the practice by which participating municipalities look only to the housing needs of existing residents, not the housing needs of persons living outside the municipality.

53. Westchester permits and does not object to the practice set forth in paragraph 52, above, even though it knows that the practice is in direct contravention of the requirements of State law, as established in the case of *Berenson v. Town of New Castle,* 38 N.Y.2d 102 (1975), and that the practice causes a disparate impact on based on race and national origin.

54. In the period January 1, 1996 through and including June 30, 2005, the Center has learned from material disclosed only to the Center by Westchester (and not publicly disclosed) that Westchester never required participating municipalities to document to Westchester, either in the course of a participating municipality's application for CDBG funding or otherwise, how the participating municipality was and would affirmatively further fair housing.

55. In the period January 1, 1996 through and including June 30, 2005, the Center has learned -- from material disclosed only to the Center by Westchester (and not publicly disclosed) -- that Westchester never required participating municipalities to identify land suitable for affordable housing development.

56. Throughout the false claims period, Westchester never required a participating municipality to actually take any steps to increase the availability of affordable housing.

57. Throughout the false claims period, Westchester never required a participating municipality to actually take any steps to otherwise affirmatively further fair housing.

58. Westchester's failure to analyze and failure to act appropriately occurred in the face of Westchester's knowledge that many participating municipalities had not taken even the most modest steps to facilitate affordable housing or otherwise affirmatively further fair housing.

59. For example, Westchester knew that, of an (altogether inadequate) goal of 5,000 units of affordable housing to be constructed in the various municipalities of Westchester in the period 1990-1999, for which each municipality was encouraged – but not required – to meet a sub-allocation, well over half of the units set forth in the sub-allocations (3,360) were not built.

60. In Harrison, for example, the allocation for 1990-1999 was 307 units. Zero were built.

61. In Rye Brook, the allocation for 1990-1999 was 112 units. Only four were built.

62. In Eastchester, the allocation for 1990-1999 was 60 units. Zero were built.

63. In Harrison, virtually no land in the town was or is zoned for multiple family use, an insurmountable deterrent to the construction of affordable housing.

64. Eastchester, to give another illustration, also severely restricts through its zoning code the building of multiple family housing.

65. In many of the other participating municipalities, exclusionary zoning practices limit affordable housing, and consequently retard fair housing efforts.

66. Harrison was one of two municipalities which actually adopted official resolutions of non-cooperation with the goal of more affordable housing units.

67. Despite all of the foregoing, Westchester never deviated from a policy that excluded the possibility of requiring any participating municipalities to do anything specific to affirmatively further fair housing as a condition of receiving the federal funds to which Westchester had been entrusted, and which thereby excluded the possibility of acting in compliance with its own obligations and certifications.

**V. Westchester's performance and knowledge**

68. Westchester's performance of its statutory, regulatory, certification-based, and grant-required obligations in respect to affirmatively furthering fair housing was so deficient or non-existence to constitute the provision of worthless services.

69. In respect to all the certifications and requests for payment based on supposed performance of its obligations referred to herein, Westchester acted with knowledge that the certifications were false and the basis for receipt of payments was false.

70. In the alternative, it is alleged that Westchester acted in reckless disregard of the truth or falsity of the certifications it made. It is further alleged that Westchester acted in reckless disregard of the truth or falsity of the explicit and/or implicit representations it made that it had and was complying with its various affirmatively furthering fair housing obligations, representations made in order to secure payments from the United States.

**VI. Damage to the Federal Government**

71. As a result of Westchester's false certifications, and as a result of seeking payments based on the false premise that it had complied with the various fair housing obligations it had undertaken, Westchester has improperly received more than $45 million in federal funds.

## CAUSES OF ACTION

72. Plaintiff Relator repeats and realleges the allegations set forth in paragraph 1- 71, above.

73. On each occasion that Westchester made a certification of the type described herein, the total number of which during the false claims period is not currently known to Relator, and on each occasion that Westchester otherwise requested or demanded payment from the federal government based on having supposedly complied with the Fair Housing Act, the Community Development Act, and with its certification-based obligations, it committed a separate violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

## DEMAND FOR JUGMENT

Plaintiff Relator respectfully requests this Court to enter judgment against defendant, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within the Complaint, as provided by the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

(b) That civil penalties of $10,000 be imposed for each and every false claim that defendant presented to the United States;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Plaintiff Relator necessarily incurred in commencing and prosecuting this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the violations of the False Claims Act for which redress in sought in this Complaint;

(e) That Plaintiff Relator be awarded the maximum amount of the proceeds allowed to it pursuant to the False Claims Act;

(f) That the Plaintiff Relator be awarded its reasonable attorneys' fees and costs; and

(g) That this Court award such other and further relief as to it seems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff Relator, on behalf of itself and the United States, demands a jury trial on all claims alleged herein.

Dated: New York, New York
April 12, 2006

Craig Gurian, Esq. (CG 6405)
Attorney for Plaintiff Relator
299 Broadway, Suite 1820
New York, New York 10007
(212) 346-7600