IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * C.A. NO. 07-00150-T-DLM
*
UNITED STATES OF AMERICA, *
ex rel., *
* APRIL 15, 2008
VS. * 10:35 A.M.
* VOLUME III
CITY OF WOONSOCKET, *
RHODE ISLAND, et al *
*
* * * * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE ERNEST C. TORRES,

SENIOR JUDGE

(Evidentiary Hearing on Defendants' Motion to Dismiss)

FOR THE PLAINTIFFS:

DAVID C. CLARKE, ESQ.
LEON A. BLAIS, ESQ.
Blais Cunningham & Crowe Chester
150 Main Street
Pawtucket, RI 02860

FOR THE DEFENDANTS:

CHRISTOPHER LAMBERT, ESQ.
City Solicitor
169 Main Street
P.O. Box B
Woonsocket, RI 02895

JUSTIN P. O'BRIEN, ESQ.
MICHAEL B. GALVIN, ESQ.
Dwyer & Collara, LLP
600 Atlantic Avenue
12th Floor
Boston, MA 02210-2211

Court Reporter: Debra D. Lajoie, RPR, FCRR, CRI

Proceeding reported and produced by computer-aided stenography

# I N D E X



| PLAINTIFF WITNESS | PAGE |
| --- | --- |
| Gordon F.B. Ondis | |
| Continued Cross-examination by Mr. Galvin | 4 |
| Redirect examination by Mr. Blais | 20 |



# E X H I B I T S



| PLAINTIFF | FOR ID | IN FULL |
| --- | --- | --- |
| 1 | 32 | |

| DEFENDANT | FOR ID | IN FULL |
| --- | --- | --- |
| B | | 62 |

15 APRIL 2008--10:35 A.M.

THE COURT: Good morning.

THE CLERK: The case before the Court is Civil Action 07-150T, United States, ex rel., Gordon F.B. Ondis vs. City of Woonsocket, Rhode Island, et al.

THE COURT: All right. This is round three of what is simply a hearing to determine whether the Court has subject matter jurisdiction over this case, so we'll pick up where we left off. Mr. Galvin?

MR. GALVIN: Thank you, Your Honor.

**CONTINUED CROSS-EXAMINATION BY MR. GALVIN**

Q. Good morning, Mr. Ondis.

A. Good morning.

Q. When we were last here, we were discussing the allegations in the section of the complaint, which we've been referring to as the true allegations, on Pages 16 through 29 of the amended complaint, do you recall that?

A. Vaguely, yes.

Q. Okay. And we were up to the allegations under the subsection on Page 25 related to the City and the Mayor's efforts to repeal tax incentives for subsidized housing, do you recall that?

A. Yes, I do.

Q. And within that section of the complaint, we began to discuss the efforts that the Mayor took in 2003 to repeal

some tax incentives-- right?--
A. I remember that, yes.
Q. Okay. -- which spans Paragraphs 69 through 73 of the complaint.
There is an allegation regarding the Mayor's activities in the spring of 2002 contained in the amended complaint, as well, do you recall that?
A. No.
Q. Let me show you the amended complaint, with the Court's permission.
MR. GALVIN: Your Honor, it doesn't seem to be coming up on the screen. The power's on.
THE COURT: Maybe the Clerk can help you, Mr. Galvin.
MR. GALVIN: Thank you, Your Honor.
Q. Can you see that, Mr. Ondis?
A. What number, counsel?
Q. Well, I'll direct your attention first to this section of the complaint under the subtitle here, "Defendant's fight to remove tax incentives to subdiesed housing."
A. Yes, I see that.
Q. And then, starting at Paragraph 70, there's allegations related to the 2003 efforts to remove subsidized housing, do you see that at Paragraph 70--
A. Yes.

Q. -- which goes on for a few paragraphs, and then, in Paragraph 74, it relates to the spring of 2002 and, "Defendant's efforts to repeal other tax policy"?
A. I have number 74 in front of me, yes.
Q. Okay. And this relates to the City's efforts to overturn the tax incentive policy toward housing rehabilitation. Do you see that in the first sentence?
THE CLERK: You can also zoom in and out to make it more clear on the machine.
MR. GALVIN: I have a hard copy, if that would help, as well.
A. Oh, that's better.
Q. Is that better?
Do you see that in Paragraph 74?
A. Yes.
Q. And that the City filed a Court action in Superior Court-- do you see that?
A. Yes.
Q. -- related to this partnership named Securing The Future And Reclaiming The Vision-- do you see that?
A. Yes.
Q. -- which was somehow affiliated with the Woonsocket Neighborhood Development Corporation, right?
A. I see that.
Q. And, in the next paragraph, it is alleged that the

Court had ruled against the City and required the City to pay $45,000, is that fair?

A. Yes.

Q. And that was another example that you used to show that the City had an anti-subsidized housing policy, right?

A. I believe so, yes.

Q. I direct your attention to Tab 16 of Defendant's Exhibit B. This is going to be difficult to read on this.

A. I can read the headlines but not the--

Q. We're going to get in to it more deeply.

THE WITNESS: Thank you.

Q. Mr. Ondis, do you have Tab 16 of Exhibit B in front of you?

A. I have it.

Q. Okay. And this purports to be a news article, and I think it's stipulated to that this is a news article that appeared in the "Woonsocket Call."

The date of it is Sunday, May 26, 2002. Do you see the date in the upper right corner?

A. I do.

Q. Okay. And it related to the City's efforts to repeal tax breaks-- right?

A. Yes.

Q. -- involving the Securing The Future And Reclamation The Vision Project? Do you see that?

A. No, I-- the first several paragraphs are obliterated. I cannot--
Q. Is it that you can't read the copy or--
A. No, I can't read that.
Q. Can you read the hard copy that's in front of you?
A. Barely.
Q. In the middle of the second column.
A. Yes, "Judge Vincent Ragosta," I can read that, yeah.
Q. Let me-- behind, in the same tab, in Tab 16, there is also a print-out from the "Woonsocket Call"'s website, which may be clearer.
A. Yes.
Q. Are you able to read that more clearly?
A. Yes.
Q. Okay. And, again, the same article, upper left-hand corner now, May 26, 2002, with the same title for the article, do you see that?
A. "City's Secret Appeal of Tax Breaks," right?
Q. Right.
A. Yes.
Q. And related to the Court case that you discussed in your complaint, right?
A. Yes.
Q. Noting the same project by the same name, Securing The Future And Reclaiming The Vision, right?

A. Well, what is the question, counsel?
Q. That it's the same project by name that's described in this article?
A. Well, I don't know. But I'll stipulate to that, that it is.
Q. Just so you're clear, it's in the-- if you look at the monitor, I'm pointing out, and I'll actually circle--
A. "Woonsocket neighborhood"-- yeah, Securing The Future And Reclaiming The Vision, yes, I see that.
Q. Same project?
A. Yes.
Q. Noting the fact that the Judge had ordered the City to reimburse that entity $45,000?
A. Yes, I see that.
Q. Okay. The same or similar allegations to the ones that you've raised in your complaint, right?
A. Apparently, yes.
Q. And it was at that portion of your complaint that you then shift to-- away from the true allegations at Page 26 in your complaint, right?
A. I have no way of knowing that.
Q. Let me show you your complaint.
After Paragraph 78, on the next page, you then go on to, "Records of Defendant's representations to HUD not made public." Do you see that?

A. I do see that.
Q. And that was a topic that we covered, I think, on the first day in some detail regarding whether the information that you had been seeking had been available to you or whether you had to get it from some other source, is that right?
A. Are you referring to the information that the City sent to HUD? Is that what we're talking about?
Q. Yes.
A. Yes.
Q. Okay. In your testimony on your direct exam on the first day, you testified that the-- you were asked a series of questions by Mr. Blais related to and including whether any of the allegations from the complaint came from news media. Do you recall that?
A. Yes, I do.
Q. And you testified no, right?
A. I believe that was my testimony, yes. And it still is.
Q. You-- and that's both-- you didn't look at any news media and then transfer that information to the complaint, right?
A. I did not.
Q. Nor did, to your knowledge, any of the team that you hired to conduct the investigation, is that right?
A. I don't know that, but I assume they did not.

Q. Well, you don't know one way or the other?
A. I really don't know.
Q. Okay. So, for all of the allegations--
A. However, counsel, to finish the answer, I don't recollect that they ever mentioned any newspaper articles. The first time I ever saw any newspaper articles was a year after we filed the complaint. So I can only conclude, in all honesty, that I really doubt that they had any knowledge of newspaper articles.
Q. Okay. To the best of your knowledge, none of the team that you hired relied on news media for a source or the press for a source-- sources of information?
A. That's right. They did not rely on it. We retrieved the information independent of the newspapers.
Q. And that is both true for the amended complaint, which is before you-- right?
A. Yes.
Q. -- and for the original complaint that was filed in this case, right?
A. Yes. The original complaint was very lengthy, as we all remember.
Q. Right.
A. But the amended complaint, being much shorter, I don't believe any of the allegations were retrieved or were based upon any newspaper articles or any other news media.

Q. I'm going to show you a portion of the original complaint that you filed in this case. Do you recall the original complaint, Mr. Ondis?
A. Do I recall the original complaint?
Q. Yes.
A. Yes.
Q. Okay. And, as you mentioned, it was a longer version of the amended complaint, is that fair?
A. Yes.
Q. The-- one of the allegations that was contained both in the amended and the original complaint related to this property known as River Bend-- is that right?-- the River Bend Condominium Development?
A. Yes.
Q. And we went through it the other day, but there was a fairly large, fairly significant housing development that was proposed in Woonsocket, and it was actually constructed with a number of restrictions, right?
A. I remember that, yes.
Q. The one-bedroom--
A. Yes, a certain number of one-bedrooms, yes, I do remember that.
Q. And, in your original complaint, you describe that allegation-- or those allegations, as well, right?
A. Yes.

Q. Okay. The-- I think the allegations begin on Paragraph 84 of the original complaint and go on for approximately six or seven paragraphs relating to the Stipulation 1 that we discussed between Paragraphs 87 and 88. Do you see that?
A. Counsel, I cannot read that. Could you adjust that for me, please?
Q. Sure.
A. Thank you.
Q. Is that better?
A. Better, thank you.
THE CLERK: There's arrows on the screen. If you look on that screen, in the corner, you can erase all and just erase the arrows.
MR. GALVIN: Is it on this screen? Touch the--
THE CLERK: Touch the corner.
MR. GALVIN: I got it.
Q. Do you see that?
A. Yes, I-- yes, I do.
Q. And it goes on related to the other stipulations, right? Do you see that-- in fact, after Stipulation 5, "The development can only-- can have only one-bedroom and two-bedroom units"--
A. I see that.
Q. -- which was the same allegation that you made in the

amended complaint, right?
A. Apparently, yes.
Q. The next paragraph, however, you quoted from a statement that a City official made to the press in February, 2003, do you see that?
A. That's Paragraph 91?
Q. Paragraph 90.
A. 90.
Q. Where it states-- excuse me-- "By spring of 2004, when the project was in financial distress," and then you go on to quote, "Michael Annarummo, Woonsocket's Administration/Public Works Director and a close associate of Defendant Mayor, stated to the press, upon learning of the economic distress, 'The rents are too high. I said that from the day they came here, and everybody laughed at me. This isn't Cumberland.'"
Do you recall that?
A. Yes.
Q. And, in fact, that statement appeared at the same time in the "Woonsocket Call." Do you recall that?
A. I do. I do recall that.
Q. Okay. And-- well, let me show it to you.
Directing your attention to Tab 14 of Exhibit B--
A. I have it.
Q. -- can you see that?

A. I see it, yeah.
Q. Okay. And this is a June 29th, 2004, article from the "Woonsocket Call" written by a Russ Olivo. Do you see that?
A. Yes.
Q. And in the second full paragraph, the same quote appears there?
A. I do see that.
Q. And this was the basis for the allegation in the complaint?
A. That is a conclusion on your part, counsel. I am sure that we retrieved the information from sources other than this newspaper.
Q. You-- your assumption that you had retrieved it from some other sources, you weren't there when Michael Annarummo said this?
A. I was not there, correct.
Q. And so you're relying on the team of others to make the assumption that you just made?
A. That's also correct, yes, and also relying on data that was-- that I looked at, separate and apart from newspapers.
Q. None of which contained the quote that Mr. Annarummo said to the press on that day?
A. Oh, I respectfully disagree. I think that it did.
Q. You, in the amended complaint-- well, do you recall, when we filed a motion to dismiss in this case, we used that

as an example of the public disclosure?
A. Not exactly, but vaguely, I do. I'm not sure.
Q. Would you like to see the--
A. I'm really not sure.
Q. Let me show you the motion to-- the memorandum in support of the motion that was filed.
You do recall that we filed a motion to dismiss this action many months ago? Is that fair?
A. Before Judge Wolfe?
Q. Before Judge Wolfe and before this Court.
A. Yes.
Q. And, in the memorandum-- well, did you see the memorandum that we filed?
A. Before Judge Wolfe?
Q. Yes.
A. Yes, I read it.
Q. What about the one that we filed in this Court?
A. I read that, also.
Q. Okay. And directing your attention to Page 10 of the memorandum that we filed on July 30th, 2007, which was a-- "Defendant's Memorandum of Law in Support of the Motion to Dismiss," directing your attention to Page 10, do you see that we used this precise example in our memorandum of law?
A. Yes, I think I remember that.
Q. And quoting the same article that I just pointed to?

A. Yes.
Q. And then, in the amended complaint, you-- you said you were involved in the drafting of the amended complaint?
A. I reviewed it, I made comments, and I was involved to it-- with it, yes.
Q. Did you decide to take out that allegation?
A. No, I don't remember that at all, counsel.
Q. Okay. But you don't dispute that, that specific allegation in the amended complaint was omitted?
A. I do remember that this Court found that the first complaint was not the model of what a complaint should be and that we did shorten it considerably.
Q. Okay.
A. That's what I do remember. We really shortened it, and we had many discussions as to what we thought should be included and what we thought should not be included, and the basis of those decisions, I can't recall. But we did shorten the complaint, and that's all I remember.
Q. I'm going to direct your attention, then, to the amended complaint in the section related to the River Bend Condo project, which is on Page 22 and Page 23. Do you see that?
A. Yes.
Q. This is the bottom of Page 23, where it relates to Stipulation 5 that we just looked at in the original

complaint?
A. I have Stipulation 5, yes.
Q. And then, after Stipulation 5, the paragraph where you quoted Mr. Annarummo's statement to the press does not appear.
A. Okay.
Q. But you don't have a recollection of why that was?
A. I don't.
Q. You did state in your direct testimony that you had no prior conflict with Mayor Menard?
A. No prior--
Q. Conflict is the word you used.
A. Conflict?
Q. That's right.
A. Absolutely.
Q. Well, was--
A. I have no conflict with Mayor Menard. I never have.
Q. Okay. But, as you sit here today, your testimony is that you have not had prior conflict, prior to this legal proceeding, with the Mayor?
A. That's right.
Q. And, therefore, within your definition of conflict is you exclude the fact that you previously sued the City?
A. I previously sued the City?
Q. Yes.

A. I think I've sued the City a couple of times, two or three times in the last 30 years over various things. But that had nothing to do with Mayor Menard.
Q. In early-- in the 2000s, there was a lawsuit about property that you wanted to develop in Woonsocket, right?
A. I don't remember that, counsel.
Q. You bought a piece of property, and there was a-- there wasn't an ability to get on to the property because it was owned by--
A. Oh, counsel, I know what you're referring to. That's property in North Smithfield, Rhode Island, that didn't have access. I did complain to the City, and I asked for access. We went to Court, and I was denied that access. But that's, in my mind, hardly a conflict with Mayor Menard.
Q. You say it was in North Smithfield. The entity that you sued to try to get access to the property was the City of Woonsocket?
A. Yes, but you referred to the property in Woonsocket.
Q. Okay. And the access that you needed to get to your property in North Smithfield was owned by the City of Woonsocket?
A. Yes. Yes, exactly.
Q. And you sued the City to try to get it, right?
A. Yes.
Q. And you lost in the Trial Court?

A. Yes.
Q. And you lost on appeal?
A. Yes.
Q. And the same City that you've sued in this case?
A. In the same City that what?
Q. The City of Woonsocket is the same party that you've sued in this case?
A. Yes. There's only one City of Woonsocket.
MR. GALVIN: No further questions.

**REDIRECT EXAMINATION BY MR. BLAIS**

Q. Mr. Ondis, you were asked, regarding Mr. Annarummo's quote, whether or not that had come from a newspaper. Do you recall being asked that by Mr. Galvin?
A. Yes.
Q. Do you recall, sir, your testimony on direct examination regarding the procedure used to obtain information from the City of Woonsocket? Specifically, do you recall a paralegal doing research at the City Hall?
A. I do.
Q. Do you recall discussions as to whether or not that paralegal was required to listen to audiotapes?
A. I do remember that.
Q. And do you recall why that paralegal was required to listen to audiotapes?
A. I think I remember that, yes.

Q. And what is your recollection?
A. That there were no indices, there were no other records aside from the tapes.
Q. Having paid the bills for the time of this paralegal, do you recall whether-- amounts of time that were spent in this effort?
A. Many, many hours. Many.
Q. And do you recall whether the paralegal listened to the actual voices-- or strike that.
Do you recall whether or not you were told that the paralegal listened to the actual voices of people participating in meetings?
A. Yes, I remember she did report that she listened with great difficulty.
Q. Now, Mr. Ondis, you were asked a number of questions, I think it was the last time we were here, regarding your requests for public records, do you recall that?
A. I do recall.
Q. And do you recall Mr. Galvin showing a number of pieces of correspondence back and forth from you and from me, my office, and the City asking for various documents?
A. I do recall that.
Q. And do you recall Mr. Galvin asking you and pointing your attention to a request for Section 8, records pertaining to Section 8? Do you recall that?

A. I do.
Q. And do you recall Mr. Galvin suggesting that the request for Section 8 documents was misdirected and was not calculated to produce documents having to do with the Community Development Block Grant program?
MR. GALVIN: Objection, Your Honor.
A. I remember that, yes.
THE COURT: He's answered the question.
Q. Since we were in Court last, Mr. Ondis, have you had an opportunity to take a look at the City's consolidated plan?
A. I have.
Q. Is that a CDBG document?
A. It is.
Q. Have you searched that document for references to the Section 8 program?
A. I have, very specifically.
Q. Are there any references to the Section 8 program in that CDBG document?
A. Yes. The words Section 8 appear at least a dozen times or more, the exact words, Section 8.
Q. And so, despite the fact that you requested Section 8-related documents, the consolidated plan was never produced by the City, was it?
A. That's correct.
Q. In fact, did you receive any documents from the City of

Woonsocket pursuant to all of those letters that were flying back and forth at various times, which were addressed by Mr. Galvin?

A. To my knowledge, we've never received one page of correspondence from the City, except for the letters, the various letters that were brought up in the last two sessions. We've never received any response for the production of any documentation whatsoever dealing with this issue.

Q. Now, I'd like to clarify something. The last time we were here, Mr. Galvin asked you a lot of questions about the comprehensive plan.

A. Yes, I remember that.

Q. Do you recall that?

A. Yes, I do.

Q. Does the comprehensive plan have anything to do with the CDBG program?

A. No.

Q. What is the comprehensive plan?

A. The comprehensive plan is a State-mandated-- it's a Statute, and it's a comprehensive plan and land use of the State of Rhode Island, and it has absolutely nothing to do with our complaint whatsoever, and I was taken aback at his questions. I really didn't-- did not know why he was asking them. We've alleged nothing in relationship to any

comprehensive plan.
Q. Have you made allegations with regard to the consolidated plan?
A. Yes, the consolidated plan, we have.
Q. They're not the same, are they?
A. They are not the same. One is a State document, which has nothing to do with this complaint whatsoever.
Q. Now, Mr. Ondis, I want to draw your attention to what has been marked as Plaintiffs' 1. I believe the Clerk has the exhibit.
THE WITNESS: Thank you.
Q. Do you see that packet of materials, Mr. Ondis?
A. I do.
Q. They have been consolidated, for the sake of brevity, as Plaintiffs' 1.
Do you recognize these documents?
A. Yes.
Q. And what are they?
A. These are summaries of the energies that we put forth to gain the information that we gained in the complaint, the allegations, a portion of it anyways.
Q. This isn't all of the work product, is it?
A. That's right. It's some of it.
Q. All right. Just quickly going through these, what is identified as the first document with the heading,

"Woonsocket Memorandum 2," what is that document, if you recall?

A. It says, "Woonsocket Memorandum 2." It's from Deb Thompson to Lee Blais. "Search for specific documents, consolidated five-year action plan, individual City of Woonsocket annual action plans, Fiscal Year 2001-'02, 2002 to 2003, '03 to '04 and '04 to '05, available to the public by City of Woonsocket."

Q. Flipping over to the next document, which is on the third page--

THE COURT: Mr. Ondis, who is Deb Thompson?

THE WITNESS: A paralegal that works for Mr. Blais.

Q. If you would take a look at the second document, Mr. Ondis, headed, "Bay Management Corp."

MR. GALVIN: Your Honor, I object to the use of the document. I don't know if he intends to admit these documents or whether he's going to just have the witness describe the documents.

Obviously, this witness doesn't have first-hand information about these documents. They purport to be from either paralegals or investigators at Mr. Blais' office. I guess, if he wants to call those people--

THE COURT: Are you going to be offering these as exhibits, Mr. Blais?

MR. BLAIS: Not for their truth, Judge. They are

corroboration of Mr. Ondis' position that he relied on original research. These are not being offered for their truth. They're simply examples of the original research that was performed, and they're offered simply in rebuttal to all these newspaper articles that purport to prove that the facts were taken out of the newspaper articles.

THE COURT: All right. So you do plan to offer them but for that limited purpose, is that correct?

MR. BLAIS: Yes, Your Honor. Yes.

MR. GALVIN: Your Honor, again, if he wants to call the paralegal or the investigator who knows something about the documents, I suppose he could do it, but I'm not sure that this is the right witness.

THE COURT: I think, for the limited purpose that Mr. Blais has explained, this is the right witness. He's entitled to show that Mr. Ondis obtained this information from some source other than the newspaper articles. I'm not sure what-- where that takes us. If the newspaper articles were published before these reports, I don't know if that's going to help you in any way, Mr. Blais, but we can sort that out later.

Well, let me ask now, rather than wasting our time. We have a number of different facts or allegations in the complaint that Mr. Galvin has at least suggested were matters of public information prior to the filing of the

complaint because they appeared in newspaper accounts.

Now, as I understand it, what you're seeking to do is to show that, before those newspaper articles appeared, Mr. Ondis had received information about these things from some other source, is that correct?

MR. BLAIS: Correct. I think the publication is irrelevant, Your Honor, if, in fact, Mr. Ondis based his suit upon other sources. And I'm simply trying to show that there are documents extant, which indicate that reliance on other sources.

THE COURT: Well, I'm not sure that, that premise is correct. I certainly would like to hear from counsel on that question. Your position is that, even if these allegations or the information that relates to the allegations appeared in newspaper accounts before the complaint, that, as long as Mr. Ondis independently got that information from some source other than the newspapers, that, that satisfies the requirements of the Statute?

MR. BLAIS: Obviously, Judge, we contend that Mr. Ondis is an original source. So, if that's the case, then none of this really means anything.

But we contend, from the language of the Statute, which says that, if there is to be a lack of subject matter jurisdiction from public disclosure, the lawsuit has to have been based upon-- that's the exact language of the Statute.

And so we contend that, based upon can be-- the publication of obscure articles that Mr. Ondis may not have seen and has testified he's not seen is not a reason for lack of subject matter jurisdiction.

The other major issue, Judge, and I'm about to get to is that the newspaper articles, even if one accepts that they are mirror images of the allegations in the complaint, are only a tiny, tiny portion of the totality of the allegations in the complaint.

The Court's order for this hearing points out correctly that it has been alleged that all of the allegations, all of the allegations in the complaint were previously disclosed.

So far, we have a few minor ones, and we have literally hundreds of other allegations regarding the essence of the complaint, which is-- the essence of the allegation, which is the lie.

None of these materials, none of them disclose a lie or an allegation of a lie. Nothing says that. There's no headline that says, Mayor accused of lying, City accused of deceiving Federal Government. There's none of that.

And that is the public disclosure that the Statute was intended to stop opportunists from using, not the fact that there may have been some tiny, tiny fact, out of many, many facts in the complaint, that may have found its way in

to a newspaper.

So this-- what I'm trying to do, Judge, is simply corroborate what Mr. Ondis had said earlier, which is simply there was independent research done. This is not the major thrust of what I-- my presentation. I'm just trying to show this as corroborative.

My major thrust here simply is that the allegation, the fundamental allegation, never appeared in any disclosure, ever, not even a hint of the main allegation, which is what this lawsuit is about.

THE COURT: Well, that's right, but I'm having difficulty following you here, Mr. Blais.

As I said, first of all, what Mr. Galvin has been attempting to do is to show that the allegations made by Mr. Blais were the subject of prior newspaper accounts, they were publicly disclosed in the newspaper.

And, as I said earlier, to the extent that you're seeking to show that Mr. Blais-- Mr. Ondis received the information that's the basis for his allegations before those newspaper articles were published, that certainly would be permissible.

As you said, you're not seeking to introduce them for the truth of what's in the articles but simply to show that Mr. Ondis had knowledge before the articles were published of the facts upon which his allegations are based.

So far, I think we're in agreement.

But when you start going beyond that, I'm not sure-- the two things I understand you to say beyond that are that, even if this information was out there in newspaper articles before Mr. Ondis made his allegations, that, as long as Mr. Ondis didn't read the newspaper articles, it doesn't matter, it doesn't affect his right to bring this lawsuit. And I think that's a dubious proposition.

The other thing that you have suggested is that these articles will some-- or these materials will somehow corroborate allegations that have been made by Mr. Ondis in the complaint. And if that's the purpose, I don't really see the need for it because it's up to Mr. Galvin to show that these allegations-- the subject matter of these allegations were public information before the allegations were made.

This is not a trial on the merits, as I said at the outset. We're not here to determine whether the allegations are true, whether there's a basis for them. The only purpose of this hearing is to determine, number one, whether the information upon which these allegations are based was public prior to the-- to them being made, and, if so, whether Mr. Ondis was the original source because, even if the newspaper articles appeared before he made the

allegations, if he was the source of that information, then he is entitled to bring the suit.

So I don't-- I fail to see-- I'm still not clear on which of those purposes you're offering these materials for. One would be perfectly permissible. The other two I don't believe would be.

MR. BLAIS: I'm not seeking for the latter two, Your Honor. I am simply trying to corroborate that-- and I, frankly, have not sat down and tried to juxtapose these documents with the newspaper articles for a couple of reasons. One, they only represent a very small amount of the allegations in the lawsuit.

And, number two, that's not my purpose. My purpose was simply to say that Mr. Ondis was engaged in an independent effort, separate and apart. That was the purpose of the proof. I don't need to spend a lot of time going through each one of these documents.

I offer the package of them for the Court's purpose. I don't need to go in to great detail on them.

THE COURT: You object?

MR. GALVIN: I do, Your Honor.

THE COURT: Your objection's sustained.

MR. GALVIN: Okay.

THE COURT: Would you like that marked as Exhibit 1 for identification, Mr. Blais?

MR. BLAIS: Yes. Thank you, Your Honor.

THE COURT: All right. The Clerk will mark that package of documents as Exhibit 1 for identification.

(Plaintiffs' Exhibit No. 1 was marked for identification.)

MR. BLAIS: All right. Your Honor, I'd like to show the witness the complaint. Since we've had some mechanical problems with that, I'd rather work from the hard document, if that is okay. I have an extra copy.

THE COURT: Are we having mechanical problems?

THE CLERK: Not that I know of.

MR. BLAIS: Well, other than-- I'm going to need to flip through this--

THE COURT: All right.

MR. BLAIS: -- and it might be just a little bit easier.

THE COURT: All right.

Q. Mr. Ondis, since we were in Court, have you had an opportunity to review the binder of newspaper articles in totality that Mr. Galvin has offered?

A. Yes, I've read them several times.

Q. And have you had a chance to at least review portions of the complaint that is before this Court?

A. Yes.

Q. Drawing your attention to Paragraph 12--

A. Yes, I see it.
Q. -- do you see it, beginning, "The Defendants concealed their scheme of deception from both HUD and private citizens through the following methods"?
A. Yes.
Q. In your review of the newspaper articles, have you found those allegations reported in any manner in any of the materials offered by Mr. Galvin?
A. None of these were referenced in any newspaper articles. Paragraph 12 I'm referring to.
Q. So is that Paragraph 12A through E?
A. Yes.
Q. Would you-- I draw your attention, please, to Page 7.
A. I have it.
Q. Would you please look at Paragraphs 18--
A. I'm looking at it.
Q. -- and continuing through Paragraph 23.
And do you see, in Paragraph 23, the allegation that the City falsely certified to HUD certain things with regard to qualifications for the program?
A. I do.
Q. And, as you reviewed those articles, do you find reported anywhere in those articles the allegations contained in Paragraphs 18 through 23 of the complaint?
A. I reviewed the articles, and none of these allegations

were referenced in any of the newspaper articles.
Q. Similarly, I'd like to draw your attention, please, to Paragraph 30, Subparagraphs A through O. Do you see that?
A. I do.
Q. As you've reviewed the materials Mr. Galvin has shown, have you seen any reference to any of the allegations contained in Paragraph 30A through O?
A. I found nothing. None of these allegations were referenced in any newspaper article presented by Mr. Galvin.
Q. How about in any of the other materials presented by Mr. Galvin? There are advertisements and other things in the binder that is Defendant's 2. Were there any references in any of those materials to the allegations referenced here?
A. No.
Q. Drawing your attention, please, to Paragraph 32, Subparagraph A through P--
A. I see it.
Q. -- in reviewing the materials Mr. Galvin has presented to the Court, do you find any of those allegations disclosed or reported in any way within those materials?
A. No. My answer is the same. None of these, clearly, were referenced in any newspaper article.
Q. Your attention to Paragraph 33, Subparagraphs A through G, do you see those allegations?

A. I do.
Q. Are those allegations reported or referenced in any way in the materials presented to the Court by the City?
A. No. Specifically, these allegations, I did look for these specifically, and these were absolutely not mentioned in any shape or form. But I did look specifically, particularly for number-- letter F.
Q. Drawing your attention to Paragraphs 37 through 40-- strike that-- through 42--
A. Yes, I see it.
Q. -- do you see any reference to those allegations within the newspaper articles presented by the City?
A. The answer is, no, none of these.
Q. Paragraph 47, please.
A. Did you say 47, counsellor?
Q. 47, yes, 4-7.
Do you see these allegations reported in any of the materials presented by the City?
A. No.
Q. The same question for Paragraphs 52 and 53-- strike that.
MR. BLAIS: I have nothing further, Your Honor.
MR. GALVIN: No questions.
THE COURT: All right. You may step down, Mr. Ondis.

THE WITNESS: Thank you, Judge.

MR. BLAIS: Your Honor, we call Mayor Menard.

THE COURT: Is she outside or--

MR. GALVIN: No, Your Honor. It was the topic of discussion on the first day where we had proposed a protective order with respect to Mayor Menard because it was the Defendant's view that--

THE COURT: I believe the arrangement was that Mayor Menard was excused subject to appearing on, what was it, half an hour notice?

MR. GALVIN: Yeah.

THE COURT: All right. And did you alert Mr. Galvin, Mr. Blais, that you were planning to call her now?

MR. BLAIS: Not additionally, other than what we did the first day in Court, Your Honor. I believe it was clear that we intended to call her.

THE COURT: All right. Well, she was supposed to get a half hour's notice. Do you have another witness to call pending her arrival?

MR. BLAIS: The Planning Director. Is he here?

MR. GALVIN: He, too, Your Honor, is on telephone notice.

MR. BLAIS: I see the Assistant Planning Director here, Your Honor. We can start with her.

THE COURT: Okay.

MR. GALVIN: Your Honor, we did file a motion for a protective order with respect to those three individuals. At the outset, the Court had, I thought, indicated that it was the Court's view that you expected to hear from Mr. Ondis to establish his evidence to try to prove subject matter jurisdiction.

We continue to be of the belief that he has failed to do so, for many of the reasons that the Court has--

THE COURT: Well, that's what he's attempting to do now, and I guess-- is the question you're raising whether these witnesses have anything to do with the proof, at least, of a prima facie case here?

MR. GALVIN: It is, Your Honor.

THE COURT: All right. What's the relevance of the testimony of these witnesses, Mr. Blais?

MR. BLAIS: Judge, it has been alleged that there has been public disclosure and that Gordon Ondis is not an original source. If anyone knows about what kinds of disclosures there have been regarding these programs and whether or not the allegation; that is, the City was not telling the truth to the Federal Government, whether that has been made anywhere, it's going to be the Mayor and the planning officials who are responsible for running the program.

And those are the people-- it's the horse's mouth, Judge, in terms of where-- who's at the City, who knows what's going on in the City and whether or not there has been a disclosure of that. And that's why we want to simply ask those questions, where was the disclosure made, if it was.

THE COURT: Well, that seems-- this is a rather unique situation here, Mr. Blais, in the sense that your position is not entirely like that of the Plaintiff in a case that would be tried on the merits.

Your-- the initial-- it's almost like a burden-shifting situation where your obligation was, first, to identify the allegations that were being made and to elicit testimony that this information was obtained by Mr. Ondis from nonpublic sources, which you have done. He has testified that he got all this information from investigations that were conducted.

So now I guess it's the-- the burden shifts to the City, which claims that there's no subject matter jurisdiction because all of these things are based on public information. So, really, it's up to Mr. Galvin now to come forward with evidence. He's attempted to do this somewhat during his cross-examination of Mr. Ondis, he's referred to newspaper articles. If he has any other information about public disclosure of the allegations contained in the

complaint before those allegations were made, he can do so.

But I don't understand what you hope to get from City employees about what Mr. Ondis' allegations are based on.

MR. BLAIS: Well, Judge, I agree we have attempted, and I believe we have done that, showed affirmatively by, up to this point, uncontroverted testimony as to the basis of the lawsuit.

However, it seems to me that the proof as to where this lawsuit came from is also-- also lies in the disproof of the City's theory here that it came from some other source. We can do it affirmatively, and we can do it, also, by attacking the City's theory. And that's what we intend--

THE COURT: Well, I think that's what you have to do. I think, it seems to me that the approach here is you can cross-examine any witnesses that Mr. Galvin presents, and you may even be entitled to present rebuttal evidence after he finishes.

But I don't understand what City employees' testimony would have to do with the initial showing that you have to make here. You've either made it, or you haven't. I don't know what the City employees can add to that.

MR. BLAIS: All right. Then we'll end for this point, Judge, subject to the presentation of the City.

THE COURT: All right. Mr. Galvin?

MR. GALVIN: We call no witnesses, Your Honor.

THE COURT: All right. So you rest?

MR. GALVIN: We do.

THE COURT: Okay. All right. I'll give counsel a chance to argue, then.

Mr. Blais, we'll start with you.

MR. BLAIS: I feel as though I've already made some arguments, Judge, so I'll just try to avoid repeating them.

I think the law is clear. Gordon Ondis, if he is an original source, the rest of the issues fundamentally go away. We conclude that he is an original source. If there ever was an insider regarding the housing business in Rhode Island, and the business we're talking about here, make no mistake, is not exclusively the City of Woonsocket. It is the housing-- the subsidized housing business in Rhode Island. He has been a player in that business for many, many years and is known well.

It is uncontroverted that he realized, when Mayor Menard strode on to one of his properties and said, "I'm going to get rid of the Section 8 projects here," that there was something wrong.

He didn't know all the details about what was wrong, but he knew fundamentally you can't be accepting Federal money on one hand and trying to knock down Federal programs for housing on the other when implicit is the

promise that you would encourage those programs.

So, perhaps thinking that maybe the Mayor's statements were in a-- made in a fit of peak, he began to look in to the allegation or the matter further, called some lawyers, made some initial inquiries and eventually hired counsel to pursue the inquiry and found out that the evidence was substantial to the effect that what the City was really doing was not what it was telling HUD.

Now, arguendo, let's give for a second to the City the notion that maybe it told everybody in the City about its true policy, the fact that it was trying to beat down affordable housing, didn't want it, didn't want any more affordable housing in this community, let's just give up, I don't concede that point but for the purposes of this discussion.

If that was the case, to tell the whole truth, the City would have had to say to HUD, HUD, this is what we're really doing over here, even though your program says you've got to encourage affordable housing, even though that's in the national objectives, even though that's in the Statute, even though we know we can't get any money unless we say these things, we're going to tell you the truth.

They didn't tell them the truth. They never told HUD. There's no evidence that they told HUD. There's no evidence that they told anybody that they were doing one

thing over here and doing something else over here.

THE COURT: Let me just interrupt you one minute, Mr. Blais. I think I just made a mistake here in the order. I had forgotten for a moment that we're here on a motion to dismiss for lack of subject matter jurisdiction, so I really should have started with Mr. Galvin.

It doesn't make any sense for you to try to tell me why Mr. Galvin is wrong before he's stated his position. So we'll come back to you after Mr. Galvin--

MR. BLAIS: I was just getting rolling, Judge.

THE COURT: Okay. All right.

MR. GALVIN: Thank you, Your Honor.

It is the City's and the Defendants' position that the Relator here has the burden of proof with respect to establishing this Court's subject matter jurisdiction for the case to proceed.

That is supported by a number of the cases that we have cited, including the Hafner case, the Leblanc case, Murphy vs. United States, a First Circuit case, 45 F-3rd 520, a 1995 case, all say that it is either the Plaintiff's burden to establish subject matter jurisdiction, or, in the False Claims Act cases that we've cited, the Relator's burden to establish subject matter jurisdiction. The City's position is that the Relator has failed to do so, and, therefore, the case should be dismissed.

In assessing subject matter jurisdiction, before I get to the substance of our arguments, I think it is important to keep in mind a couple of the hallmarks of subject matter jurisdiction. One is to construe Federal subject matter jurisdiction narrowly and in favor of a limited jurisdiction, which, as the Court knows, this is.

Second, really the policy or principles that underlie the amendments in 1986 to the False Claims Act, which attempted to strike at the balance that the Court alluded to at the very outset of this hearing, where Congress tried to walk this fine line of encouraging real whistleblowers, people with truly valuable inside information, to come forward, to ferret out fraud against the Federal Government, versus encouraging opportunistic, parasitic, they referred to them as gadfly outsiders, from coming forward and really cashing in on something that essentially was there and available for any stranger to the fraud, as the Courts refer to it, from coming and looking in to the situation and then bringing a case.

That was the balance that Congress attempted to strike in the Statute in limiting the subject matter in the way that it did. I know that the Court has already referred to some of the ambiguity, as many of the Courts that have struggled with cases in this area have looked at. Some of the terms are not immediately apparent as to what they mean.

I think that the City's position, with respect to both public disclosure and original source, fall well within the vast majority of the cases to consider this. There will be some, obviously, important legal principles that apply. I don't think that there's a lot of dispute as to the facts here, Your Honor. I know that it's taken us a number of days to establish what the facts are, and I apologize if we were too lengthy.

The Relator had filed an affidavit in the case where he describes this investigation that ensued after this May, 2004, incident involving the Mayor and described at some length the investigation that he really hired others to perform. It is our position that hiring others to perform an investigation is not enough to qualify him under the Statute.

One of the important legal rulings that the Court will need to make at this stage is what it means for public disclosure to be based on-- or the allegations to be based on public disclosure.

Relator, in his papers and his preliminary argument, has told this Court that he adopts the minority view that the Relator believes that the proper interpretation of that phrase is actually derived from; that is, that, unless we can prove that Gordon Ondis read and relied on the newspaper and one court case that we submitted

in the Defendants' Exhibit B, that we're precluded from arguing that his case is based upon public disclosure.

I think it's a misinterpretation of the law. We've cited cases to the Court already. There's a recent case, a District of Massachusetts case, that goes in to this at some length, it was a Judge Saris case, it's In Re: Pharmaceutical Litigation, I have a Westlaw cite, if it's helpful for the Court, 2008 Westlaw 435497, where she sort of lays this out in-- much more eloquently than I have and in more detail.

She says that the majority rule is that, when the allegations in Relator's complaint are similar to or supported by or the same as those that have been publicly disclosed, there's public disclosure regardless of where the Relator obtained his information. We think that is the case here.

Another important legal question for the Court relates to-- another argument that I know that Relator's counsel is going to make and already has related to whether it was necessary for the City to show that the allegation of fraud itself had been disclosed; that is, that I guess Relator would have it that the City had to tell HUD that it had been defrauding it for the past ten or 15 years in order for the public disclosure bar to kick in.

Again, that-- the majority of Courts, to look at

that case, including a case that the Relator cites favorably, the Springfield Railway case, a D.C. Circuit Court case from 1994, which has been well received by other courts, including Courts in the First Circuit and the District of Massachusetts, all say that that's not true, that it's not the allegation of fraud that needs to be disclosed, but the components of the fraud; that is, the alleged false statements and the alleged true statements.

And if it's this X plus Y equals Z formula, where Z equals the fraud and X and Y equals the true and false statements, it's really that, that which the City has attempted to show were disclosed, both the alleged false statements in the Relator's complaint, where he takes the position-- there's a number of-- there's many, many statements that he has culled out of City filings to HUD over the years. It's the City's position that those were publicly disclosed. They were-- in a couple of different ways.

First, and I think it's undisputed that Relator obtained those materials as a result of a FOIA request. He testified to that on his direct examination. He confirmed it repeatedly on cross-examination, that he went under FOIA, the Freedom of Information Act, the Federal request, and there are numerous cases to say that, when that happens, that the materials that are received, particularly Federal

materials, are either administrative reports or administrative investigations.

This was not a point that we addressed in our papers. I'd like to give the Court two or three cites, if it's helpful on this point. That is, United States ex rel. Reagan vs. East Texas Medical Center, 274, F-Supp 2d 824-845, Southern District of Texas in 2003.

U.S. ex rel. Grynderg, G-r-y-n-d-e-r-g, vs. Prax Air, 207 F-Supp. 2d 1163, at Page 1164, where the Court said "Disclosure pursuant to a FOIA request is widely recognized as sufficient to make the transaction public within the meaning of the FCA."

In a Court of Appeals Court case, which is widely cited approvingly, United States ex rel. Mystic PBT vs. Housing Authority of the City of Pittsburgh, 186 F-3rd 376, at Pages 383 through 84, a Third Circuit case from 1999, and that Court goes in to the FOIA request at some length and says that the purpose of FOIA is so that people can determine what is going on with Government.

It uses that rationale underlying FOIA to explain why, when a document is requested and received, that it falls within the definition that Congress provided under the False Claims Act to constitute administrative reports and an administrative investigation.

That's one theory as to why the materials that the

Relator in this case cites for the alleged statements themselves have been public disclosure.

It's also the City's position, based on his own testimony, that this stuff was generated as a result of an administrative process. The Statute defines when it is that materials constitute public information that includes administrative hearings, which has been interpreted to include state or municipal hearings, all of which, in the materials that we submitted, and I think by his own admission, these reports were the result of an administrative process that included public hearings.

That is what the materials that we attached to Exhibit B at Tabs 22-52 is intended to show, that it was all an open and administrative process, which resulted in the very reports that he claims contained the false statements.

So, in at least two different ways, the alleged statements that he claims are false were public and fall within public disclosure within the meaning of the FCA.

Moving on in the complaint, we did spend quite a bit of time reviewing the false statements that are alleged on Pages 16-29 of the amended complaint. Here it is important to answer something that Relator's claimed. Again, he says that, well, the news articles themselves don't say that the City's been defrauding HUD for the past ten or 15 years.

Again, we think that that's legally incorrect. What it does show, and what we attempted to emphasize in that, is that the underlying essential elements of his fraud, the fraud that is described in the complaint, was disclosed. And it sounds to me like Relator is getting to the point where he concedes that.

His essential claim that the City had a housing policy that disfavored new subsidized housing was a fact that is repeated in several of the articles that we have presented to the Court, including Tab 4, which was an article where Mayor Menard disclosed, in 2001, what her policy was with respect to housing, why, as she put it, in Tab 4, there was a moratorium on new subsidized housing.

It was disclosed in a variety of other articles where other developments came up for approval or input from the City in numerous places. Journalists for both "The Providence Journal" and "Woonsocket Call" indicated that this had been a long-standing policy of the City, not to have new subsidized housing. That, in our view, is the core of Relator's allegations with respect to this complaint.

After that, within the complaint, he goes on to cite, by my count, there's ten examples. And we have articles that describe-- excuse me. There's 11 examples. We have articles that describe ten of the 11, specific examples that he uses of this City policy with respect to

different housing projects or housing-related activity, such as the tax incentives that we spent some time on.

THE COURT: What about the 11th?

MR. GALVIN: Well, Your Honor, the 11th-- and I don't have the amended complaint with me-- we did ask him about-- do you have the amended complaint? There was-- in Paragraph 55, there was a project called Excel Management, which was seeking some sort of variance from a zoning restriction for three-bedroom units to be funded. It was cited in June of 1999. It came up to the Zoning Board, and apparently the City argued against a variance to be issued.

In our view, Your Honor, there are numerous examples that he cites of other projects where that got treated essentially the same way. The River Bend Condominium project is one that we spent considerable time on. Thus far, we haven't found a newspaper article with respect to the Excel Management, Inc., but I spent some time with the Relator with respect to that specific project, and he conceded that it was essentially the same as the other projects.

He-- the mere fact that one of the examples of the alleged fraudulent policy that the City had, that we can't show that one specific example I don't think constitutes some sort of prohibition against the Court concluding that there has been disclosure.

THE COURT: Well, there's also an allegation that the City represented to HUD that all of the information would be filed at the library, I believe it was, and that it wasn't filed at the library. What about that?

MR. GALVIN: There is that allegation, Your Honor. It's a bit-- it was a bit difficult for us to approach it because we tried to be mindful of the Court's admonition at the outset where we weren't going to be challenging sort of the factual basis. And, to us, in part, it got in to sort of, you know, the underlying facts, whether it was true or not that it was available at the library.

We didn't think it was the purpose of this hearing to disclose just that. We did get in to it to present affirmative evidence that it was available at the library. Instead, Your Honor, what we did was to show that-- first of all, in Exhibit A1, it has the specific request that the Relators made allegedly for the material. I'll let the Court read the paragraph that the Relators claim constitutes this clear and unambiguous request for the material.

It doesn't mention CDBG or Community Development. It wasn't directed to the Planning Department. It specifically mentions Section 8 materials.

But even there, Your Honor, we showed that, within, like, six weeks or so after the request was routed sort of properly within the City, that it was offered up to the

Relators. They said-- there's a letter from Paulette Miller that Mr. Ondis says--

THE COURT: But that's a little different than whether it was filed at the library, isn't it?

Is there some-- is there some-- was there any evidence that the-- that there were newspaper articles indicating that this material had not been filed with the library, or is it your position that, in fact, this material was filed with the library and, because the Court had made it clear that we weren't here to decide the merits of the claims, that you didn't present that evidence?

MR. GALVIN: It was part of the latter, Your Honor. I don't take the position that we have newspaper articles to say that the CDBG applications are available at the library. I do have dozens of notices throughout the time period '00 or '01 through '05, where it says that all of the documents are available at the Housing-- the Planning Department within the City. They have public hearings with respect to each of these CDBG applications, the approvals, the actual funding.

And each time, as the Court's-- as Exhibit B contains in it, there are notices to the public, "We're looking for your input, please come, give us your comments or criticism with respect to the City's housing policy, particularly with respect to CDBG applications and grants,"

for each of the years.

And I'm happy to furnish to the Court the list of the specific exhibits. It says, okay, the CDBG application is done, it's here at the City, if anyone would like it, come get it. Here it is. It's publicly disclosed in the news media.

I know the Relator takes the position that those articles should not be admitted. He filed a stipulation where he acknowledged, I think, the majority of the articles that we cited are admissible and should be admitted. With respect to two different categories, he says that they should not.

One of them relates to the notices that the City published or had published in the "Woonsocket Call." I think it's well within the Statute. It doesn't say-- the Statute itself does not contain the restriction that Relator's counsel would have the Court impose on it with respect to only articles that are written by a person hired by the newspaper that subsequently appear in the newspaper constitute public disclosure within the meaning of the FCA.

Instead, the FCA broadly says information in news media. There's no allegation that the "Woonsocket Call" is not a news media outlet. In fact, Relator concedes that articles written in the "Woonsocket Call" qualify. These things were-- the City put it there to disclose. This is

how you-- this is how we solicit input, this is how we let you know that these plans are available.

We have that, we have the letter that Paulette Miller wrote in August of 2004 disclosing. Mr. Blais, if he wants this stuff, they didn't interpret his original request to include it, if he wants it, here it is. It's available for him. Please come, or just let me know, and I'll make it available to you.

That-- in the context of that, Your Honor, this allegation that, oh, well, it wasn't available at the library, at least when Relator, or his investigator, or a paralegal of Mr. Blais, went to check, I just don't see how that, in and of itself, could prevent some public disclosure bar from occurring here.

THE COURT: All right. Mr. Galvin, you have a few more minutes to wrap up.

MR. GALVIN: Yeah, let me get to original source. I think it's the other component of this.

If the Court does conclude that there has been public disclosure, as the Court has indicated, the second portion of the inquiry is that the Court consider whether Mr. Ondis is an original source, which the Courts and the Statute say requires both direct and independent knowledge.

The City's position is that the Relator, by his own admission, lacks both of those things. He lacks direct

information of any allegation in the complaint. He wasn't a first-hand witness to anything that occurred, by his own admission, not even the May 17th, 2004, incident where the Mayor allegedly strode on to his property that we've heard so much about. He wasn't there. Others were there. It was reported to him. Second-hand information, the Courts are clear that, that does not qualify him as an original source when--

THE COURT: Even when they're the Relator's agents?

MR. GALVIN: Yes, Your Honor. Yes. I'd point the Court to O'Keefe, a District of Mass. case, where a Relator, who, in that case, it was a-- attempting to build a new train line in Massachusetts, and the Relator, who was an MIT grad with a background in environmental engineering, attempted to bring a lawsuit claiming that the MTA and the public authorities had lied about the environmental impact of the train, that case was dismissed under public disclosure bar.

The Court in that case found that the Relator, even though he conduct-- even though he had expertise in the area, he was an MIT-trained engineer who had studied environmental protection, what he did, he, unlike here where we have Mr. Blais, his paralegal, other hired people go out and conduct the investigation, there in O'Keefe, the Relator conducted the investigation himself. The Court found that,

that wasn't enough because he relied on reports and other information that was generated. He pulled it all together.

Other Courts have specifically said that interviews and site visits don't constitute original-- don't make someone have direct and independent knowledge. That's the Barth case, an Eighth Circuit case that's cited in our papers.

In the Crindler case, a Second Circuit case, the Relator attempted to rely on information that his prior civil attorney had developed, getting to the Court's point about whether they're even agents of his, and the Court said, no, that when you rely on somebody else, unless you have the information on a first-hand basis, what you individually saw, observed, heard, read, again, getting back to the original point, it's to encourage inside whistleblowers.

Relator has this theory that he's an insider to the industry. I've never seen it, I've never-- no Court case that I've seen has recognized an insider to the industry. Oftentimes, there's people who are on the outside who are, like, some sales reps to another pharmaceutical company, they've all said-- the Courts are unanimous in saying that those types of people, despite being within the pharmaceutical industry, aren't insiders because they're job's not on the line, because they're not going to suffer

adverse consequences.

Even-- I think the one case that the Relator relies the most, the Lammers case, it is a Seventh Circuit case where the Court affirmed summary judgment against the Relator, but there's a short discussion. There, the Relator had a-- he owned a busing company that was replaced by a public busing company to bus children in the City of Green Bay. And after the City approved the new contract with the new entity, he went out and conducted his own investigation. He rode the buses, he observed the schedule and the--

THE COURT: All right. You have two minutes left.

MR. GALVIN: This is the last point I'm making, Your Honor.

-- and the Court there said, well, it affirmed, there was some dicta in the case that Relator relies on, but even there, the Court cautioned that they weren't going to encourage that type of second-hand information.

And I think that is a candid instructive to what the Court ought to conclude in this case. He went out, he had some knowledge about the housing, but he went out and hired others to do the work.

I think, under those circumstances, he is precisely the type of outsider that the Statute's meant to exclude from having subject matter jurisdiction, and I would ask the Court to find that.

THE COURT: All right. Mr. Blais?

MR. BLAIS: Your Honor, I'm going to refrain from citing again to the case law, which is in the many memos that have been filed on this topic for the last two and a half years. None of these cases are new, and we've killed enough trees, I think, for these filings through the years.

But I'd rather focus my comments on the facts because-- and putting those in perspective because this was, in fact, to be an evidentiary hearing.

There is no question that, that binder is filled with legal notices and display notices about what the City was going to do about public disclosure of the program. It says, "We're going to have a hearing, and we're going to tell you all about the program, and it's available." These are the same promises, the very same promises that were in the applications and the yearly action plans. They're not disclosure. They're promises of disclosure.

Yet, when somebody really steps up to the plate to try to find the information, going to the public library, for example, it's not there. When somebody tries to get information about the City's policies regarding any housing program-- we said Section 8, but that's broadly used in the State through the years-- we get nothing, not a single piece of paper.

So, yes, we have plenty of promises, and those

promises are in these articles because the Federal regulations require them and for no other reason. So the idea that there has been-- that there has been public notice of what the City was really doing is just false.

This idea that's being floated here that, somehow or other, if one uses an access to public records mechanism, FOIA, or, in the Westchester case that was found not too long ago using a State access mechanism, that, somehow or other, that keeps you from being able to file a complaint in this action is just plain wrong.

That is akin to saying that, when we file the false claim with the Government, because it can be retrieved by a citizen who happens to want to go and look at it, because that's possible, because it becomes a public record, when we file it, therefore, that's disclosure and, therefore, that the Act can't apply. If that were to be the case, Judge, there couldn't be any actions by nonoriginal sources, ever, because the very act of filing the document would constitute disclosure. That's what they would have this Court adopt.

That would also eviscerate any criminal prosecution of filing false documents against the Federal Government because the theory might not apply there. Well, gee, I told you all about it, it wasn't a secret, it wasn't a lie because I disclosed it publicly, and it was disclosed when I put it in to the public sphere.

THE COURT: Mr. Blais, can you point to any factual allegations-- now I'm talking about factual, as opposed to conclusions, facts as opposed to conclusions. Can you point to any factual allegations in the complaint that were not the subject of any of the newspaper articles that are contained in Exhibit B, I believe it is?

MR. BLAIS: The whole litany that I took Mr. Ondis down through. For example, here is a false certification, the City certified, Mayor Menard put her name on a document and said, "This City has followed fair housing principles, complied with the Fair Housing Law, certified, I certify it." That's one very clear one. It's not true. The City didn't do it.

The fact of that certification is in the file, and it's not referenced anywhere, anywhere, conclusion-- in a conclusory manner--

THE COURT: Give me a fact on which your statement that that's not true is based.

MR. BLAIS: Because Fair Housing requires maximization, to the extent possible, of affordable housing opportunities, all right? So the fact that they weren't doing that and the fact of her certification that they were doing that are in opposite.

THE COURT: What is a fact alleged in the complaint that supports or would support the conclusion that, that

statement was false?

MR. BLAIS: The allegation-- the statements in the complaint replete that the City has taken certain actions to encourage, to promote, to support affordable housing. I mean, there are a number of them in the complaint. I can go back over the--

THE COURT: Well, just take one. Just pick one.

MR. BLAIS: Well, can I take a look at the complaint, Judge?

THE COURT: Sure. While Mr. Blais is looking, I don't believe Exhibit B is a full exhibit, as I look at the list here. Did you move admission of that Exhibit, Mr. Galvin?

MR. GALVIN: Your Honor, I don't recall. I thought that the Relator had filed a stipulation regarding its admissibility, and perhaps I misunderstood that a stipulation regarding it being admissible would change it from being marked from identification to a full exhibit. If I haven't, I would ask that the Court--

THE COURT: Well, there are two questions: One, which seemed to me to be-- it shouldn't be a question, is whether these are, in fact, true copies of articles that appeared in the newspaper, in other words, the authenticity question.

The second is whether they're relevant and should

be admitted on that ground.

As I understood it, counsel were going to get together and see whether there was a genuine dispute as to whether they were authentic?

MR. BLAIS: And we filed our-- we filed a stipulation, Judge, and then counsel provided some additional clarification, and we filed an amended stipulation with the Court.

THE COURT: All right. So do you agree that these articles appeared in the "Woonsocket Call" or whether-- I know that isn't a concession they're admissible, but at least are they authentic?

MR. BLAIS: All of the documents that are supposed to be newspaper articles, that look like clippings, those sorts of things, we have stipulated to those.

THE COURT: Okay.

MR. BLAIS: Not to their relevance, but to the fact that they appeared.

THE COURT: All right. And I understand your objection to the relevance, but I overrule that objection. And Exhibit B may be admitted as a full exhibit, then.

MR. GALVIN: Thank you, Your Honor.

(Defendants' Exhibit B was admitted in full.)

THE COURT: All right. Now, Mr. Blais, you were

looking for--

MR. BLAIS: Yeah, Judge, starting on Page 9, the category, "Defendant's specific false claims and assertions made to HUD to induce payment of money," and starting at Paragraph 28 to 30, and then a whole series of specific quotations that we are alleging in the complaint are false.

THE COURT: But what I'm asking you for is a specific factual allegation that would support that conclusion.

MR. BLAIS: Well, the whole section about the City's true policy, which is, for example, they certified to HUD, we're going to support zoning, various other policies that will allow affordable housing.

And we have alleged, in a whole series of specific instances having to do with all these various projects, where that wasn't true.

THE COURT: All right. Speaking of zoning, one of the facts, I believe, alleged in the complaint that you're relying on is that-- or one project, the name of which I don't recall, the City opposed an application for a variance, is that-- am I correct?

MR. BLAIS: There are a whole series of them like that, yes.

THE COURT: Okay. Now, pick one.

MR. BLAIS: Well, I think one of them was the--

THE COURT: Was it River Bend? Was that one?

MR. BLAIS: River Bend.

THE COURT: Okay.

MR. BLAIS: And there are a whole series of those where the complaint, in very specific terms, describes how the City took affirmative actions to prevent those projects from being used for affordable housing on a repeated systematic basis.

THE COURT: All right. Why don't you continue your argument, Mr. Blais.

MR. BLAIS: So my point is, Judge, the complaint is in two pieces. It says, here's what was told to HUD, and here's what really happened.

The what-was-told-to-HUD piece, my point was that the City seems to be taking the position that, because we filed it, that constitutes public disclosure. That would eviscerate the Act. That simply is not the case. And it was simply found to be not the case in the New York litigation involving virtually the same type of Federal program, which was a CDBG program.

There was reference, Judge, to the X and the Y formula that has been used in these cases, that in order for there to be disclosure, X, meaning the truth and Y meaning the falsehood, has to be combined to conclude Z, the fraud.

The X portion of this; that is, the statements to

HUD, were not disclosed. There is certainly no juxtaposition to the truth and the falsehood in no way that anyone, including HUD, who was deceived here, could possibly ever see it. There is no evidence, other than the testimony of Mr. Ondis, that there was ever disclosure in any form. The only evidence before this Court is the uncontroverted testimony of Mr. Ondis with regard to all of the facts here.

The bottom line, after all is said and done, is that this City was doing one thing and telling HUD it was doing the other. That deception is more than just material because this program, the CDBG program, has as its purpose fulfillment of the national objectives. One of the major portions is affordable housing for poor citizens.

So if you step back and look at this, Judge, and say-- there is no other conclusion here other than the City was misleading HUD.

Now, as to Mr. Ondis not being an insider, I don't know where this definition of-- that someone has to be a City employee in order to be an insider ever came from because I would suggest that probably most City employees have no ability to understand the nuances of the CDBG program or, indeed, the affordable housing market.

If there was ever anybody in that situation, it was Mr. Ondis. To suggest that Mr. Ondis had to be all-knowing, omniscient, if you will, to be an insider and to be an

original source simply is illogical.

If one has a suspicion, one simply needs the ability to make inquiry in a very complex matter, such as this, involving thousands of pages of documents submitted to the Federal Government over a multi-year period, involving review of records that were extremely difficult to obtain because of the lack of indices and the fact that, for one to find out what happened in a meeting, one had to sit and listen to hours of municipal meetings, it simply doesn't make any sense that a single individual would have to be in that situation.

Indeed, to require that would effectively eviscerate this Act with regard to dealing with any complex matter. The whole motivation to deal with complex frauds would be taken away because there would be no ability to do that. And so I don't think that the Statute can be or should be read in that fashion.

Judge, there is no evidence before the Court, other than what Mr. Ondis has put before the Court-- we have heard now for three years theories of public disclosure, other than this one that has been raised today, the theory of the filing constitutes a public disclosure, but this has been repeated and repeated and repeated, and it is absolutely clear that the majority of the allegations in that complaint never saw the light of day, never saw themselves in news

print, never were discussed on a radio talk show, nobody ever got up and said, Madam Mayor, you're lying to the Federal Government, you shouldn't be able to get this money. It was not raised in a political campaign. It never came up ever, ever, ever.

And that is the type of public disclosure that I believe the Act was intended to preclude. That is true opportunism, when somebody hears that allegation and runs to the courthouse steps.

As a result, Judge, we ask that the motion be denied.

MR. GALVIN: Your Honor, can I respond to one point?

THE COURT: Very briefly.

MR. GALVIN: Reference was made to the Westchester case. I have a copy, if the Court would like it, and I do think it's important. It's a Southern District of New York case from July of 2007 that does involve CDBG applications requests grants.

In that case, the Court, Judge Cote from the Southern District, did acknowledge that information that was obtained pursuant to a FOIA request falls within the public disclosure bar. Contrary to what Mr. Blais has indicated, in this particular case, the Court-- the request was made pursuant to a State Freedom of Information Request, they

call it FOIAL in New York. The Court parsed the Statute to conclude that a State FOIA request was not covered by the Statute by the way the Statute was written for that particular State law.

Here, of course, Mr. Blais couldn't-- excuse me. Mr. Ondis couldn't have been clearer they obtained the materials pursuant to a FOIA request, a Freedom of Information Act request. Obviously, the materials that they sought was at HUD, a Federal entity, in Boston. The request would have been made pursuant to a FOIA request. I'm happy to hand the case up or cite-- give you the cite, if the Court would like either one.

THE COURT: Have you got a copy for Mr. Blais?

MR. GALVIN: Sure. That was the only point, Your Honor.

THE COURT: All right. Obviously, I'm going to have to go through some of the exhibits and consider counsel's arguments, so I'll take this matter under advisement. I don't know if I'll be issuing a bench decision or a written decision, but I'll do one or the other as soon as I can.

All right. Court will be in recess.

(The proceeding was concluded at 12:27 p.m.)

C E R T I F I C A T I O N

I, Debra D. Lajoie, RPR-RMR-FCRR-CRI, do hereby certify that the foregoing pages are a true and accurate transcript of my stenographic notes in the above-entitled case.

/s/ Debra D. Lajoie

6/2/08